# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREVOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:11-CV-01177 (RMC) |
| ) | |
| UNITED STATES FOOD AND DRUG ) | |
| ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## BRIEF OF *AMICI CURIAE* ALCOA INC. AND THE UNITED STEELWORKERS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Eric P. Gotting
D.C. Bar No. 456406
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C.  20001
Phone:  (202) 434-4269
Facsimile:  (202) 434-4646
Email:  gotting@khlaw.com

Dated:  December 20, 2013

Counsel for *Amici Curiae*

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................1

ARGUMENT ...............................................................................................................3

    A.  Chemical Exposures In The Workplace ........................................................4

    B.  DSW Enhances Workplace Safety ................................................................6

    C.  Safety and Health Risks of Regulatory and Litigation Delays ...................9

CONCLUSION ...........................................................................................................12

## TABLE OF AUTHORITIES

**Regulations**

21 C.F.R. §§ 807.81-807.100 ........................................................................................3

21 C.F.R. Part 312 ........................................................................................................3

21 C.F.R. Part 812 ........................................................................................................3

Alcoa Inc. ("Alcoa") and the United Steelworkers ("USW") submit this brief as *amici curiae* in support of Prevor's Motion For Summary Judgment filed in the above-captioned case.[1]

## INTEREST OF *AMICI CURIAE*

Alcoa is a multi-national aluminum company that operates hundreds of industrial plants around the world. The USW is North America's largest labor union whose members work in numerous manufacturing facilities across the United States. Many of Alcoa's employees and USW's members are potentially exposed to hazardous materials on a daily basis. Every effort is made by *amici*, therefore, to ensure the health and safety of these workers.[2]

In particular, Alcoa is the world's leading producer of primary aluminum and fabricated aluminum, and its largest miner of bauxite and refiner of alumina. The company employs approximately 61,000 people at over 200 locations in 30 countries around the world. It places a high priority on the health and safety of its employees and contractors. For example, in 2012 the company's "days away, restricted, or transferred" ("DART") rate, which is the company's primary metric used to measure safety conditions at its domestic plants, was almost 80% lower than the U.S. manufacturing average.[3] Alcoa's health and safety programs are aimed, in part, at protecting employees from chemical burns. Ex. A, Shelby Decl. at ¶ 1.

---

[1] No party or party's counsel authored this brief in whole or in part, and no party, party's counsel, or any other person, other than *amici curiae* or their counsel, contributed money intended to fund the preparation or filing of this brief.

[2] Alcoa previously filed an *amici curiae* brief and a supplemental brief in support of Prevor in a related case (Case No. 1:11-CV-01187). *See* Dkt. 19, 30. This Court, in Minute Orders dated February 2, 2012, and April 9, 2013, granted Alcoa's motions for leave to file those briefs. That case was terminated on September 25, 2012, after the Court granted Prevor's motion for summary judgment and remanded the matter back to the U.S. Food and Drug Administration ("FDA"). The instant case was filed by Prevor challenging the agency's decision on remand.

[3] *See* http://www.alcoa.com (accessed December 20, 2013).

The USW has 1.2 million active and retired members who have worked in a variety of industrial sectors covering a wide range of the U.S. economy.  In addition to aluminum, these areas include oil, steel, paper and pulp, chemical, rubber, plastics, construction, atomic energy, mining and health care.  Ex. B, Sallman Decl. at ¶ 2.  As such, the USW is constantly striving to promote worker safety and to improve working conditions.  *Id.* at ¶ 6.  For instance, the union and employers, like Alcoa, work together to reduce the risk of exposures to hazardous materials.  This includes conducting joint accident and fatality investigations at facilities where USW members work, including incidents that involve chemical burns.  *Id.* at ¶ 1.[4]

With regard to the product at issue in this case, Prevor's Diphoterine Skin Wash ("DSW"), Alcoa uses DSW in its non-U.S. plants, which are located in Australia, Latin America, Europe, and Jamaica, to effectively treat chemical burns and exposure-related injuries.  Ex. A, Shelby Decl. at ¶ 2.[5]  Moreover, USW represented sites outside the United States, including Canada, also rely on DSW to minimize or eliminate risks posed by chemicals.  Ex. B, Sallman Decl. at ¶ 2.  Therefore, Alcoa and the USW, whose members work in some of Alcoa's U.S.-based facilities, are greatly interested in the outcome of this lawsuit, as it will likely determine if and when they will be able to import and use DSW in this country to prevent and mitigate workplace injuries associated with exposures to hazardous materials.

*Amici* are concerned that FDA's decision to regulate DSW as a drug, and the further delays occasioned by the agency's on-going refusal to grant Prevor's request to regulate DSW as a medical device, will mean that U.S. workers will continue to face unnecessary risks.  Neither Alcoa nor the USW have been able to find a product in this country that works nearly as well as

---

[4] *See also* http://www.usw.org (accessed December 20, 2013).

[5] The alumina refining process utilizes millions of gallons of liquid caustic soda.  This creates the potential for chemical exposures throughout the process.  *Id.*

DSW at preventing or reducing the severity of chemical burns.  Ex. A, Shelby Decl. at ¶ 3; Ex. B, Sallman Decl. at ¶ 3.  While Prevor's Motion for Summary Judgment demonstrates why FDA has incorrectly designated DSW as a drug, Alcoa and the USW are well positioned to provide this Court with a real world perspective on the critical role that this product has played in protecting workers from exposures to hazardous materials, as well as highlight the dangers associated with any continued delays in FDA's proceedings.

## ARGUMENT

FDA has never acknowledged, whether in its briefing during the prior litigation or in its written decision following remand to once again designate DSW as a drug, the serious implications that an unwarranted delay in approving the product would have on worker safety. Indeed, for Alcoa and the USW, as well as many others working in various industrial settings, improperly designating DSW as a drug could have significant ramifications.

It goes without saying that FDA's pre-market approval process for drugs is a more in-depth, time consuming, and costly endeavor when compared to the pre-market process for devices.[6]  Therefore, if FDA designates DSW as a drug, it could further delay the availability of the product in the United States, if not risk convincing Prevor to abandon marketing efforts in this country altogether.

A drawn-out regulatory process, moreover, would only add to the delays already occasioned by FDA's continuing refusal to designate DSW as a device.  The agency initially denied Prevor's Request for Designation ("RFD") over four years ago on October 16, 2009.

---

[6] The investigational exemption requirements for drugs at 21 C.F.R. Part 312 are more burdensome than the exemption requirements for medical devices at 21 C.F.R. Part 812.  Most medical devices, moreover, are either exempt from pre-clearance requirements or qualify for a streamlined clearance consistent with Section 510(k) under the Food, Drug, and Cosmetic Act. *See* 21 C.F.R. §§ 807.81-807.100.

Since then, FDA has dug its heels in and twice more denied Prevor's request, the first time after the company asked the agency to reconsider its initial decision and the second after this Court vacated and remanded the matter back to FDA for further consideration. The parties are now on their second round of litigation with no satisfactory resolution in sight.

Alcoa and the USW, however, simply cannot bear the brunt of further delays if this product continues to get bogged down in litigation and is then required to wind its way through a protracted regulatory process before it becomes available for use in the United States. As discussed below, Alcoa employees and USW members have suffered a substantial number of chemical burn incidents and related lost work days in just the last two years as Prevor and FDA have battled in court. As there is no comparable substitute for DSW in this country, it is imperative that FDA correctly proceed under the device review process so that companies and their employees have ready access to this important product. Otherwise, every day that passes without DSW in our workplaces means that American workers will suffer even more unnecessary and, in some instances, completely avoidable injuries.

### A.    Chemical Exposures In The Workplace

According to the United States Occupational Safety & Health Administration ("OSHA"), "[s]kin exposure to chemicals in the workplace is a significant problem in the US." Ex. C (OSHA, Dermal Exposure – Safety and Health Topics, 2013, at 1 (excerpt)). For example, the Bureau of Labor Statistics ("BLS") recently determined that for 2012 there were 3,560 nonfatal chemical burns that resulted in days away from work. Ex. D (BLS, News Release, Nonfatal Occupational Injuries and Illnesses Requiring Days Away From Work – 2012, Table 5 (excerpt)), November 26, 2013). Moreover, based on the same BLS data, the median number of days missed was four (4) days. *Id.* That means half of the employees suffering from chemical

4

burns last year and who were out of work for some period of time missed, at a minimum, a week's worth of work. *Id.* (Table 5 stating that "[h]alf the cases involved more days and half involved less days than a specified median").

Indeed, for employees the consequences of such accidents can be significant. Chemical exposures may result in minor symptoms, like irritation, itching, and swelling, but also more serious injuries, such as burns, allergic reactions, scarring, seizures, unconsciousness, and even death. *See, e.g.,* Ex. E (OSHA, Technical Manual (OTM), Occupational Skin Exposure, June, 24, 2008, at 1 (excerpt)) and Ex. F (National Institutes of Health, Medline Plus, Chemical Burn or Reaction, 2013, at 1 (excerpt)). Damages, moreover, are not limited to physical injuries. A recent study of workers' compensation claims in Washington State filed between 2001-08 found high rates of mental disorders and psychological distress among workers who were hospitalized for chemical and other types of burns, including anxiety, depression, and emotional distress. Ex. G at 369 (Anderson, N.J., et al., Psychiatric Diagnoses After Hospitalization With Work-Related Burn Injuries in Washington State, *Journal of Burn Care & Research* 2011; Vol. 32, No. 3 (excerpt)). The study's authors found that 26% of the chemical burns resulted in a psychiatric diagnosis even though they constituted only 10.3% of the total number of burns. *Id.* at 374.

Worker health and safety is not the only issue at stake. The economic costs resulting from chemical exposures in the workplace can be substantial. These take the form of lost work days, declining productivity, rising insurance costs, and medical and disability payments. And these costs add up quickly. In 1996, the National Institute for Occupational Safety and Health ("NIOSH") estimated that the total annual costs associated with occupational-related skin diseases, with the most common cause being exposure to toxic chemicals, could reach $1 billion. Ex. H (NIOSH, National Occupational Research Agenda, Publication No. 96-115, April 1996

(excerpt)).  The study of Washington State workers also highlighted the importance of treating occupational burns early and effectively to avoid costly hospital treatment.  Specifically, while hospitalizations in Washington State between 2001-08 from work-related burn injuries (including chemical burns) accounted for only 1.7% of all burns reported in the workers' compensation system, they represented 51% of the resulting costs.  Ex. G at 369.

### B.    DSW Enhances Workplace Safety

A high premium must be placed on ensuring that FDA does not unduly delay the marketing of DSW by improperly regulating it as a drug.  This is nowhere more evident than in several declarations submitted by health and safety personnel at Alcoa and the USW, demonstrating that DSW far outperforms other means of dealing with chemical exposures.

For example, Dan Kirkwood, the Health & Safety Manager for Alcoa's Wagerup plant in Western Australia, states that they use several DSW products to protect employees and contractors at the site.  Ex. I, Kirkwood Decl. at ¶¶ 1-3.[7]  The plant requires all workers to carry a 100 ml DSW canister with them at all times.  *Id.* at ¶ 3.  The plant also has stand-alone DSW containers in its medical and security center so that additional supplies are available.  *Id.*  In the event of a chemical-related accident, the worker would use the DSW product before proceeding to an onsite safety shower to further wash off the chemical from the skin or other exposed area (*e.g.,* eyes or mouth).  *Id.* at ¶¶ 2-3; *see also* Ex. A, Shelby Decl. at ¶ 3.

On numerous occasions, the DSW products prevented or minimized chemical burns and other related injuries following a workplace exposure.  According to Mr. Kirkwood, his plant's experience with DSW has been "extremely positive."  *Id.* at ¶ 4.  He states that DSW has prevented outright any chemical burns following an accident, and eliminated or reduced the need

---

[7] Alcoa originally submitted Mr. Kirkwood's declaration as part the company's *amici* brief in the prior litigation. Case No. 1:11-CV-01187. *See* Dkt. 19.

for further treatment where a chemical entered a worker's eye. *Id.* Mr. Kirkwood notes that Alcoa's emergency response personnel have characterized the device's performance as "outstanding" and witnessed chemical burns dissipating after DSW was applied. *Id.* He is not aware of any device that is as easy to use and effective as DSW at washing off and neutralizing chemicals. *Id.* at ¶ 5. Mr. Kirkwood concludes that the product has not only protected the health and safety of his workers, but also helped reduce medical costs and expenses. *Id.*

Furthermore, Steve Sallman, a Health and Safety Specialist for the USW who works out of the union's headquarters in Pittsburgh, PA, highlights the advantages that DSW offers over emergency eyewash and shower stations, the primary response measure used by companies to guard against injuries associated with chemical burns. Ex. B, Sallman Decl.[8] He notes that one problem with these stations is that they are difficult to locate next to every potential accident site. As a result, when a worker is injured, he/she will not be able to immediately wash off the hazardous material, but will instead have to rush to the closest station, during which time the chemical continues to destroy bodily tissue. *Id.* at ¶¶ 3-4.

And once the worker finally reaches the station, there may be additional problems that limit effective treatment. For instance, Mr. Sallman points out that the USW has seen instances where low water pressure prevents the eyewash and shower equipment from being used simultaneously. *Id.* at ¶ 4. USW members have also been involved in accidents where the initial water temperature was such that the worker could not comfortably use the station, especially on sensitive areas like the eyes, or where the station's equipment is essentially frozen due to cold weather because additional controls had not been installed or maintained. *Id.*

---

[8] These stations typically use water to decontaminate the eyes and skin. *Id.* at ¶ 4.

According to Mr. Sallman, DSW would help avoid the limitations associated with emergency eyewash and shower stations.  For example, it is his understanding that in facilities outside the United States workers have immediate access to the DSW which allows them to quickly treat chemical burns and prevent further damage to bodily tissue before they make their way to the station.  *Id.* at ¶ 5.  Moreover, the spraying action from the DSW canister means that the employee can wash the chemical off the body immediately without having to assume the risk that the water pressure at the station will be too low or the equipment has been exposed to freezing conditions.  *Id.*  Finally, DSW is always stored at room temperature so that employees can comfortably apply the spray to sensitive areas.  *Id.*

The dramatic effect that DSW can have in reducing the frequency of injuries resulting from chemical burns is clearly evident when data from Alcoa's foreign plants are compared to its domestic operations.  Laurie Shelby, Alcoa's Environmental, Health and Safety Director – Primary Products, looked at the first aid and serious injury rates for Alcoa's Point Comfort, Texas plant and its international facilities for the time period of April 2011 to the present – *i.e.*, since the FDA denied Prevor's request that the agency reconsider its initial decision to treat DSW as a drug.  Ex. A, Shelby Decl. at ¶¶ 4-5.  Based on these data, it is clear that Point Comfort, which did not have access to DSW, had much higher rates of chemical burn injuries, including serious accidents, than its foreign counterparts.

| Location | First Aid Rate | Serious Injury Rate |
|---|---|---|
| Western Australia | 1.95 | 0.32 |
| Point Comfort | 5.04 | 0.70 |
| Jamaica | 0.16 | 0.00 |
| Latin America | 0.18 | 0.02 |
| Europe | 0.25 | 0.04 |

*Id.* at ¶ 4.

In fact, Alcoa has continued to see the same disparities between Alcoa's domestic and international facilities even during the short time period of April 2013 to the present – *i.e.,* since Alcoa made its last filing in the prior lawsuit brought by Prevor against FDA.[9]

| Location | First Aid Rate | Serious Injury Rate |
|---|---|---|
| Western Australia | 2.00 | 0.16 |
| Point Comfort | 2.50 | 0.72 |
| Jamaica | 0.16 | 0.00 |
| Latin America | 0.09 | 0.00 |
| Europe | 0.18 | 0.00 |

*Id.* at ¶ 6.[10]

According to Ms. Shelby, the availability of DSW in Alcoa's non-U.S. plants is directly responsible for the lower first aid and serious injury rates when compared to Point Comfort. If DSW had been readily accessible to Alcoa's Point Comfort employees, the number and severity of the injuries would have been minimized or completely avoided. *Id.* at ¶ 8.

C.     **Safety and Health Risks of Regulatory and Litigation Delays**

These tables also reveal the substantial health and safety risks that Alcoa's U.S. employees and USW members will face if FDA requires DSW to track through the more burdensome and time-consuming regulatory process for drugs or Prevor is forced to continue litigating this dispute in court. For instance, in the more than 2½ years that have passed since FDA denied Alcoa's request for reconsideration, Point Comfort has had 101 chemical burn incidents, 14 of which required extensive medical attention and resulted in 652 lost work days. *Id.* at ¶ 5. Furthermore, in just the past eight months since Alcoa submitted its last briefing to

---

[9] *See* Case No. 1:11-CV-01187, Alcoa Supp. Br., Dkt. No. 30, April 9, 2013.

[10] Incident rates for the two tables were calculated based on 200,000 hours worked multiplied by the number of employees and then divided by the hours worked.

this Court in the prior litigation, Point Comfort has experienced four serious injuries from chemical burns, with 147 associated lost days. *Id.* at ¶ 7.

Jennifer Schumaker, RN, the Occupational Nurse at Alcoa's Point Comfort plant, briefly describes in her declaration several of these incidents which resulted in significant chemical burns. It is her opinion that the severity of these injures would have been lessened if DSW had been available for use immediately after the accident. Ex. J, Schumaker Decl. at ¶ 4.

In the first incident, which occurred on September 9, 2013, five workers were injured when they were sprayed with a caustic liquid while cleaning plant equipment. Two employees received minor burns that required first aid treatment, while another had 1st and 2nd degree burns of the face, wrist, and scalp, which resulted in a referral to a burn specialist. *Id.* at ¶ 5.

The two remaining workers, however, suffered substantial burns that have required extensive treatment and resulted in lost work days. The first employee is a Production Supervisor who had 1st and 2nd degree burns over large areas, including his right arm, right leg, and torso. The second employee is an Area Operator who had significant burns over his chest and limbs. Both were hospitalized in burn units, have gone through skin grafting and many painful treatment sessions, and are now continuing with outpatient treatments. *Id.*

As to the second incident, which happened on October 24, 2013, a supervisor for a contractor was injured in the area of the plant where dissolved alumina is recovered from the plant process liquid. The contractor suffered significant burns to his face, chest, back, hands, and arms. He was airlifted by helicopter to a burn unit and went through numerous painful skin grafts. He continues to receive extensive outpatient treatment. *Id.* at ¶ 6.

Mr. Sallman also recounts a recent accident from 2012 involving a USW member in the United States who did not have access to DSW. In this instance, the employee was cleaning out

parts of a tank when a caustic liquid was suddenly released, spraying him in the face and other parts of his body.  The caustic began to burn his skin instantly, as it had collected in one of his gloves and started to saturate his clothing.  After quickly removing some of his clothes, he struggled to an adjacent office/lab room that contained some bottles of neutralizer (apparently consisting of a water and saline solution), which he used on his injuries.  The employee then ran to the emergency eyewash and shower station, but the water pressure was not sufficient to operate both at the same time, so he had to alternate between the two.  Other employees eventually brought in a water hose so that he could flush his eyes and body simultaneously.  In the end, the employee suffered life-altering, severe chemical burns to various parts of his body, which could have been minimized if the employer had DSW.  Ex. B, Sallman Decl. at ¶ 6.[11]

For these individuals, as well as many others who have suffered chemical burns in the workplace, their physical injuries will not be the only lasting effects.  As Mr. Sallman points out, chemical burn victims must deal with restricted and lost work days, reduced working and earning capacity, and the mental toll related to the injuries themselves.  *Id.* at ¶ 7.  Ms. Schumaker also notes that the repeated, intrusive, and painful medical procedures required to heal and, in some cases, survive a chemical burn can profoundly affect the employee, his/her work life, and the worker's family long after the accident.  Ex. J, Schumaker Decl. at ¶ 3.

And while these stories illustrate the devastating impact that chemical burns can have on individuals who have been involved in an accident, even those workers who have been fortunate enough to avoid any hazardous materials exposures have been affected by FDA's delay.  Mr. Sallman notes that the USW has seen increased stress levels in its members because they know that there is a product out there that could prevent or reduce the severity of chemical burns in the

---

[11] Mr. Sallman also notes in his declaration that, since 2004, there have been 12 member fatalities due to hazardous materials exposures at USW represented workplaces.  *Id.* at ¶ 7.

event of an accident, but realize it will not be available until FDA gives its approval.  Ex. B, Sallman Decl. at ¶ 7.  Instead, these employees must go to work every day and encounter substantial risks that workers outside of the United States do not.

Without access to DSW, any further regulatory and litigation delays will put Alcoa's employees and the USW's members at a continued increased risk of chemical burns.  Moreover, Alcoa could experience increased costs, as there may be a growing number of hospitalizations or missed work days, as well as rising medical and insurance expenses.  Accordingly, this Court should take whatever steps are necessary to prevent any additional unwarranted delays in bringing DSW to market in the United States.

## CONCLUSION

Based on the foregoing, *amici* Alcoa and the USW respectfully request that this Court grant Prevor's Motion For Summary Judgment.

Respectfully submitted,

Eric P. Gotting
D.C. Bar No. 456406
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C.  20001
Phone:  (202) 434-4269
Facsimile:  (202) 434-4646
Email:  gotting@khlaw.com

Dated:  December 20, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2013, I deposited copies of the foregoing *amici curiae* brief of Alcoa Inc. and the USW in the U.S. Mail addressed to the following:

Jeffrey N. Gibbs
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W., Suite 1200
Washington, D.C.  20005
jgibbs@hpm.com

John W. M. Claud
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C.  20044
john.claud@usdoj.gov

I further certify that I sent copies of the brief to the above counsel by email.

Eric P. Gotting

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREVOR,<br><br>   Plaintiff,<br><br>    v.<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 1:13-CV-01177 (RMC) |

### DECLARATION OF LAURIE SHELBY

I, Laurie Shelby, declare as follows:

1. I am currently the Environmental, Health and Safety ("EHS") Director – Primary Products for Alcoa. I have served in that position since May 2008 and have worked in the occupational health and safety field since 1983. As EHS Director, I oversee 4,600 employees and contractors at Alcoa. My responsibilities include developing and improving health and safety programs at nine U.S. facilities, including our alumina plant in Point Comfort, Texas, and reducing the number and severity of worker-related injuries, such as those related to chemical exposures and burns.

2. Alcoa uses Diphoterine Skin Wash ("DSW") at its non-U.S. facilities located in Australia, Latin America, Europe and Jamaica to protect employees from chemical burns and related injuries working in alumina refineries. The alumina refining process utilizes millions of gallons of liquid caustic soda in the reduction of bauxite to alumina. This creates the potential for chemical exposures throughout the manufacturing process. I learned about DSW through technology sharing efforts with our international facilities.

1

3.     Alcoa requires each person working in its non-U.S. refineries to carry a small pressurized canister of DSW at all times. If an individual's body, including the skin, face, eye, or mouth, is exposed to a caustic liquid, DSW is used immediately to wash off the chemical through a pressurized spray and to neutralize the caustic. This minimizes or eliminates any harm resulting from the chemical burn. The employees are instructed to use DSW before going to a safety shower. Unfortunately, we have been unable to find a product in the United States that works as effectively as DSW.

4.     Our facilities outside the United States have shown substantial reductions in the number of significant chemical burns through the use of DSW when compared to our domestic plants. For example, if I compare our Point Comfort refinery to our non-U.S. facilities, for the period since the U.S. Food and Drug Administration ("FDA") rejected Prevor's request that the agency reconsider its decision to regulate DSW as a drug (April 2011 – present), we see the following differences:[1]

| Location | First Aid Rate | Serious Injury Rate |
|---|---|---|
| Western Australia | 1.95 | 0.32 |
| Point Comfort | 5.04 | 0.70 |
| Jamaica | 0.16 | 0.00 |
| Latin America | 0.18 | 0.02 |
| Europe | 0.25 | 0.04 |

5.     Based on these data, it is clear that Point Comfort had much higher first aid and serious injury rates due to chemical exposures than its foreign counterparts which had access to DSW. During that time period, Point Comfort had 101 burn incidents, 14 of which required extensive medical attention and resulted in 652 lost work days.

---

[1] For the tables appearing in paragraphs 4 and 6, incident rates were calculated based on 200,000 hours worked multiplied by the number of employees and then divided by the hours worked.

6.     We have continued to see the same disparities between Alcoa's domestic and international facilities even since the company made its last filing with this Court during the prior lawsuit brought by Prevor against FDA (April 2013 – present). *See* Case No. 1:11-CV-01187 (RMC), Alcoa Supp. Br., Dkt. No. 30, April 9, 2013.

| Location | First Aid Rate | Serious Injury Rate |
|---|---|---|
| Western Australia | 2.00 | 0.16 |
| Point Comfort | 2.50 | 0.72 |
| Jamaica | 0.16 | 0.00 |
| Latin America | 0.09 | 0.00 |
| Europe | 0.18 | 0.00 |

7.     Point Comfort experienced four serious injuries during this short period of time resulting from chemical burns, with 147 related lost days. Jennifer Schumaker, a nurse at Point Comfort, has also submitted a declaration describing several of these incidents.

8.     Based on our experience, the availability of DSW in Alcoa's non-U.S. plants is directly responsible for the lower first aid and serious injury rates when compared to Point Comfort. If DSW had been readily accessible to our Point Comfort employees, the number and severity of the injuries would have been minimized or completly avoided.

9.     Alcoa takes seriously its responsibility to prevent significant chemical exposures in the workplace.   The company requires good safety practices, provides personal protective equipment such as goggles and face shields, and strategically locates emergency eyewash and shower stations throughout the facility; however, there are times when these measures are not adequate.   We want to require all domestic personnel to carry a small canister of DSW as do our employees in non-U.S. plants. But Alcoa cannot do that until FDA makes a decision and allows DSW into the United States.

3

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December /6, 2013

Laurie Shelby

4845-5315-4071, v. 1

4

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREVOR, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES FOOD AND DRUG )<br>ADMINISTRATION, )<br><br>Defendant. ) | Case No. 1:13-CV-01177 (RMC) |

## DECLARATION OF STEVE SALLMAN

I, Steve Sallman, declare as follows:

1.     I am currently a Health & Safety Specialist, in the Health, Safety & Environment Department for United Steelworkers ("USW") and I work out of the union's headquarters in Pittsburgh, PA. I have served in this capacity for almost 10 years. My responsibilities include providing technical assistance and conducting accident and fatality investigations at facilities where USW members work, including incidents involving workers who have been exposed to hazardous materials. I have conducted approximately 15 investigations involving chemical burns, sometimes jointly with the company involved, with injuries ranging from exposures that required some level of treatment, to burns that resulted in life-altering injuries and fatalities.

2.     Our union members work in many industrial sectors, both in the United States and Canada, where workers are at risk of harmful exposures to hazardous materials. These areas include aluminum, oil, steel, pulp and paper, chemical, rubber, plastics, construction, atomic energy, mining, and health care. Many of the USW's members

1

working in non-U.S. facilities, such as workplaces in Canada, have access to Diphoterine

Skin Wash ("DSW") to effectively treat chemical burns.

3.      While I do not have first-hand knowledge of DSW's use, it is my understanding

from discussions with others that DSW can help minimize or avoid injuries from

chemical burns.  If there is an exposure, workers and managers use DSW to immediately

wash off the hazardous material through a spraying action.   And if any hazardous

material remains, most if not all of it is encapsulated by the product and washed off the

body.  We are not aware of any product in the United States that performs as effectively

as DSW.  Unfortunately, we have seen accidents in this country involving substantial

injuries, including some that will adversely affect the worker for the remainder of his/her

life, that would have been mitigated or reduced if DSW was available.

4.      DSW cannot be imported or sold in the United States, so domestic employers face

several limitations when trying to protect workers from chemical burns.  For example,

many workplaces rely on emergency eyewash and shower equipment stations as the

primary response measure, which typically uses water to decontaminate the eyes and

skin. One problem with this approach is that it is difficult to locate a station next to every

potential accident site.  As a result, when a worker is injured, he/she will not be able to

immediately wash off the hazardous material, but will instead have to rush to the closest

station, during which time the hazardous material continues to destroy bodily tissue.  And

there may be additional issues once the worker reaches the station.  For example, we have

seen instances where low water pressure prevents the eyewash and shower equipment

from being used at the same time.  Our members have also been involved in accidents

where the initial water temperature was such that the worker could not comfortably use

2

the station, especially where there had been a hazardous materials exposure to the eyes. Finally, emergency eyewash and shower stations can also freeze in the winter months if additional controls are not installed and maintained.

5. The DSW product helps avoid all of these limitations. It is my understanding that in facilities outside the United States workers have immediate access to DSW. This allows workers to treat chemical burns quickly and prevent further damage to bodily tissue before they make their way to an emergency eyewash and shower station. The spraying action from the DSW canister also means that the employee can quickly wash the chemical off the body without having to assume the risk that the water pressure at the eyewash or shower station may be too low or that the equipment has been exposed to freezing conditions. Finally, DSW is always stored at room temperature so that employees can comfortably apply the spray to sensitive areas, like the eyes.

6. A recent accident involving a USW member here in the United States, who had only worked on his job for a short period time, illustrates some of the dangers faced by workers who do not have access to DSW. In this instance, the employee was cleaning out parts of a tank when a caustic liquid was suddenly released, spraying him in the face and other parts of his body. The caustic began to burn his skin instantly, as it had collected in one of his gloves and started to saturate his clothing. After quickly removing some of his clothes, he struggled to an adjacent office/lab room that contained some bottles of neutralizer (apparently consisting of a water and saline solution), which he used on his injuries. The employee then ran to the emergency eyewash and shower station, but the water pressure was not sufficient to operate both at the same time, so he had to alternate between the two. Other employees eventually brought in a water hose so that he

could flush his eyes and body simultaneously. In the end, the employee suffered life-altering, severe chemical burns to various parts of his body, which could have been minimized if the employer had DSW.

7.     The USW and employers, like Alcoa, work together to reduce the risk of exposures to hazardous materials, but system failures can and do happen which is why DSW is greatly needed. Since January 2004, there have been 12 member deaths due to hazardous materials exposures at USW represented workplaces. Most workers who suffer chemical burns survive the incident, but still experience lasting effects. There are restricted and lost work days, reduced working and earning capacity, and the mental toll related to the physical injuries. And even with those USW members who have not been involved in an accident, we have seen increased stress in the U.S. workforce because they know that there is a product out there that could prevent or reduce the severity of chemical burns, but realize that it will not be available until FDA gives its approval.


In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on December 9, 2013

Steve Sallman

4829-7229-2887, v. 2

4

# EXHIBIT C

UNITED STATES
DEPARTMENT OF LABOR

OSHA

[SEARCH]

A to Z Index | En español | Contact Us | FAQs | About OSHA
Was this page helpful?

OSHA QuickTakes Newsletter    RSS Feeds    Print This Page    Text Size

Occupational Safety & Health Administration    We Can Help    What's New | Offices

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom |
| Small Business |

OSHA

back to SAFETY AND HEALTH TOPICS

# Dermal Exposure

Skin exposure to chemicals in the workplace is a significant problem in the US. Both the number of cases and the rate of skin disease in the US exceeds recordable respiratory illnesses. In 2010, 34,400 recordable skin diseases were reported by the Bureau of Labor Statistics (BLS) at a rate of 3.4 injuries per 10,000 employees, compared to 19,300 respiratory illnesses with a rate of 1.9 illnesses per 10,000 employees. [See Table 6a and Table 6b in Workplace Injuries and Illnesses - 2010 [268 KB PDF*, 29 pages].



**Contents**

- Home
- OSHA Standards
- Hazard Recognition
- Exposure Evaluation
- Control and Prevention
- Additional Information

Page last reviewed: 08/01/2008

Most chemicals are readily absorbed through the skin and can cause other health effects and/or contribute to the dose absorbed by inhalation of the chemical from the air. Many studies indicate that absorption of chemicals through the skin can occur without being noticed by the worker. In many cases, skin is a more significant route of exposure than the lung. This is particularly true for non-volatile chemicals which are relatively toxic and which remain on work surfaces for long periods of time. The number of occupational illnesses caused by skin absorption of chemicals is not known. However, it is argued that an estimated 60,000 deaths and 860,000 occupational illnesses per year in the US attributed to occupational exposure, a relatively small percentage caused by skin exposure would represent a significant health risk.[1]

Dermal exposures are addressed in specific standards for the general industry, shipyard employment, marine terminals, the construction industry, and identification, classification, and regulation of carcinogens.

## OSHA Standards

This section highlights OSHA standards, preambles to final rules (background to final rules), and directives (instructions for compliance officers) related to dermal exposure. The following information is only a partial list of references to skin exposure in OSHA standards, guidelines, and chemical sampling methods.

**Note:** Twenty-five states, Puerto Rico and the Virgin Islands have OSHA-approved State Plans and have adopted their own standards and enforcement policies. For the most part, these States adopt standards that are identical to Federal OSHA. However, some States have adopted different standards applicable to this topic or may have different enforcement policies.

General Industry (29 CFR 1910)

- 1910 Subpart H, Hazardous materials [related topic page]
  - 1910.120, Hazardous waste operations and emergency response [related topic page]
  - 1910.124, General requirements for dipping and coating operations

- 1910 Subpart I, Personal protective equipment [related topic page]
  - 1910.134, Respiratory protection [related topic page]
  - Appendix B, Non-mandatory compliance guidelines for hazard assessment and personal protective equipment selection

- 1910 Subpart J, General environmental controls
  - 1910.141, Sanitation

- 1910 Subpart Z, Toxic and hazardous substances
  - 1910.1000, Air contaminants
  - 1910.1026, Chromium (VI) [related topic page]
  - 1910.1028, Benzene [related topic page]
    - Appendix A, Substance safety data sheet, benzene
  - 1910.1044, 1,2-dibromo-3-chloropropane
    - Appendix A, Substance safety data sheet for DBCP
    - Appendix C, Medical surveillance guidelines for DBCP
  - 1910.1045, Acrylonitrile
  - 1910.1048, Formaldehyde [related topic page]
    - Appendix A, Substance technical guidelines for formalin
    - Appendix C, Medical surveillance - formaldehyde [related topic page]
  - 1910.1050, Methylenedianiline
    - Appendix A, Substance data sheet, for 4,4'-Methylenedianiline
  - 1910.1051, 1,3-Butadiene [related topic page]
  - 1910.1052, Methylene chloride [related topic page]
  - 1910.1200, Hazard communication [related topic page]
    - Appendix A, Health hazard definitions (Mandatory)

Shipyard Employment (29 CFR 1915)

- 1915 Subpart D, Welding, cutting and heating

**EXHIBIT D**

 **NEWS RELEASE** 

BUREAU OF LABOR STATISTICS
U.S. DEPARTMENT OF LABOR

---

**For release 10:00 a.m. (EST) Tuesday, November 26, 2013**                      USDL-13-2257

Technical information:  (202) 691-6170 • iifstaff@bls.gov • www.bls.gov/iif/oshcdnew.htm
Media contact:               (202) 691-5902 • PressOffice@bls.gov

## NONFATAL OCCUPATIONAL INJURIES AND ILLNESSES REQUIRING DAYS AWAY FROM WORK, 2012

The rate of nonfatal occupational injury and illness cases requiring days away from work to recuperate
was 112 cases per 10,000 full-time workers in 2012, down from 117 in 2011, according to the U.S.
Bureau of Labor Statistics. The total number of private industry, state government, and local
government cases with days away from work decreased 2 percent to 1,153,980 cases. The median days
away from work—a key measure of severity of injuries and illnesses—was 9 days. This is one day more
than in 2011. (See table 1.)

**Key Findings:**

- Private sector incidence rate for days-away-from-work cases decreased to 102 per 10,000 full-time
  workers in 2012 from 105 in 2011. (See tables 1 and 3.) Despite the overall decrease, four
  occupational groups had increases in their incidence rates in 2012 including: computer and
  mathematical occupations; community and social service occupations; personal care and service
  occupations; and transportation and material moving occupations. The number of cases for these
  four broad occupation groups also increased. Transportation and material moving occupations had
  the highest incidence rate (258, up from 251 in 2011) of all occupation groups. (See table 3.)

- Local government incidence rate decreased to 178 cases per 10,000 full-time workers in 2012 from
  193 in 2011. (See tables 1 and 3.) The number of cases also decreased 9 percent from the prior year
  to 181,340 cases. Among local government workers, the number of cases for building and grounds
  cleaning and maintenance occupations decreased 21 percent to 19,120 cases. The rate also decreased
  to 439 cases.

- Transit and intercity bus drivers had an incidence rate of 852 cases per 10,000 full-time workers for
  all ownerships. The majority of injuries and illnesses to bus drivers occurred in local government
  with a rate of 1,026—statistically unchanged from the previous year. For private sector bus drivers,
  the incidence rate increased to 417 from 342 in 2011. Three other occupations with high rates and at
  least 0.1 percent of full-time equivalent employment occurred primarily in local government or state
  government:  police and sheriff's patrol officers; correctional officers; and fire fighters. (See table 4.)

- The incidence rate and total number of cases resulting from violence and other injuries by persons or
  animals increased for the private sector in 2012. (See table 1.) The rate increased slightly to 4 cases
  per 10,000 full-time workers and the total number of violence cases increased 6 percent. Increases in
  the number of violence cases in several industry sectors contributed to the rate increase—notably the
  health care and social assistance sector had a 6 percent increase to 19,360 cases.

- Musculoskeletal disorder (MSD) cases (388,060) accounted for 34 percent of all injury and illness
  cases in 2012. Both the incidence rate and case count remained statistically unchanged from the
  previous year; however the median days away from work increased by 1 day to a median of 12 days.
  Laborer and freight, stock, and material movers had the highest number of MSD cases and an
  incidence rate of 164 per 10,000 full-time workers—up from 140 in 2011. (See table 18.)

TABLE 5. Number, incidence rate[1], and median days away from work[2] for nonfatal occupational injuries and illnesses involving days away from work[3] by injury or illness characteristics and ownership, 2012

| Characteristic | Total private, State, and local government | | | Private industry[4,5,6] | | | State government[4,5,6] | | | Local government[4,5,6] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Incidence rate | Median days away from work | Number | Incidence rate | Median days away from work | Number | Incidence rate | Median days away from work | Number | Incidence rate | Median days away from work |
| Total | 1,153,980 | 112.4 | 9 | 905,690 | 102.3 | 8 | 66,950 | 167.7 | 10 | 181,340 | 177.8 | 9 |
| Musculoskeletal disorders[7] | 388,060 | 37.8 | 12 | 314,470 | 35.5 | 11 | 18,380 | 46.0 | 14 | 55,210 | 54.1 | 12 |
| Nature of injury or illness: | | | | | | | | | | | | |
| Fractures | 84,700 | 8.2 | 30 | 71,830 | 8.1 | 32 | 3,090 | 7.8 | 33 | 9,770 | 9.6 | 25 |
| Sprains, strains, tears | 443,560 | 43.2 | 10 | 340,900 | 38.5 | 10 | 26,860 | 67.3 | 14 | 75,800 | 74.3 | 10 |
| Amputations | 5,280 | .5 | 26 | 5,100 | .6 | 26 | 30 | .1 | 47 | 150 | .1 | 16 |
| Cuts, lacerations, punctures | 98,380 | 9.6 | 4 | 85,030 | 9.6 | 3 | 2,810 | 7.0 | 5 | 10,540 | 10.3 | 4 |
| Cuts, lacerations | 81,610 | 7.9 | 3 | 71,880 | 8.1 | 3 | 2,120 | 5.3 | 5 | 7,610 | 7.5 | 3 |
| Punctures (except gunshot wounds) | 16,770 | 1.6 | 5 | 13,150 | 1.5 | 4 | 690 | 1.7 | 5 | 2,930 | 2.9 | 5 |
| Bruises, contusions | 97,540 | 9.5 | 6 | 74,150 | 8.4 | 5 | 6,930 | 17.4 | 5 | 16,460 | 16.1 | 6 |
| Heat (thermal) burns | 3,560 | .3 | 5 | 3,250 | .4 | 5 | 70 | .2 | 3 | 240 | .2 | 7 |
| Chemical burns and corrosions | 16,280 | 1.6 | 4 | 13,700 | 1.5 | 4 | 280 | .7 | 3 | 2,300 | 2.3 | 7 |
| Multiple traumatic injuries | 38,190 | 3.7 | 10 | 27,640 | 3.1 | 11 | 3,270 | 8.2 | 11 | 7,290 | 7.1 | 10 |
| With sprains | 16,320 | 1.6 | 9 | 11,760 | 1.3 | 9 | 1,620 | 4.1 | 8 | 3,450 | 3.4 | 8 |
| With fractures | 7,510 | .7 | 42 | 6,280 | .7 | 28 | 380 | 1.0 | 58 | 850 | .8 | 42 |
| Soreness, pain | 171,930 | 16.7 | 9 | 130,900 | 14.8 | 10 | 11,750 | 29.4 | 9 | 29,280 | 28.7 | 9 |
| Carpal tunnel syndrome | 8,610 | .8 | 34 | 7,540 | .9 | 30 | 340 | .9 | 27 | 720 | .7 | 34 |
| Tendonitis (other or unspecified) | 3,020 | .3 | 16 | 2,680 | .3 | 15 | 90 | .2 | 33 | 250 | .2 | 16 |
| All other natures | 182,940 | 17.8 | 7 | 142,980 | 16.2 | 8 | 11,430 | 28.6 | 13 | 28,540 | 28.0 | 7 |
| Event or exposure leading to injury or illness: | | | | | | | | | | | | |
| Violence and other injuries by persons or animal | 73,470 | 7.2 | 6 | 35,370 | 4.0 | 5 | 14,290 | 35.8 | 8 | 23,810 | 23.3 | 7 |
| Intentional injury by other person | 29,840 | 2.9 | 7 | 12,410 | 1.4 | 5 | 7,340 | 18.4 | 8 | 10,090 | 9.9 | 9 |
| Injury by person unintentional or intent unknown | 23,510 | 2.3 | 7 | 12,050 | 1.4 | 7 | 6,080 | 15.2 | 10 | 11,290 | 11.2 | 6 |
| Animal and insect related incidents | 13,580 | 1.3 | 3 | 10,560 | 1.2 | 3 | 810 | 2.0 | 10 | 2,210 | 2.2 | 2 |
| Transportation incidents | 58,240 | 5.7 | 10 | 41,300 | 4.7 | 9 | 3,680 | 9.2 | 12 | 13,260 | 13.0 | 7 |
| Roadway incidents involving motorized land vehicles | 41,420 | 4.0 | 8 | 27,840 | 3.1 | 8 | 3,130 | 7.8 | 10 | 10,460 | 10.3 | 6 |
| Fires and explosions | 2,240 | .2 | 8 | 1,750 | .2 | 9 | 70 | .2 | 4 | 420 | .4 | 3 |
| Falls, slips, trips | 285,350 | 27.8 | 11 | 219,630 | 24.8 | 11 | 16,060 | 40.2 | 10 | 49,590 | 48.7 | 10 |
| Slips, trips without fall | 49,660 | 4.7 | 11 | 38,140 | 4.3 | 11 | 3,550 | 8.9 | 12 | 8,960 | 8.8 | 10 |
| Fall on same level | 172,930 | 16.8 | 10 | 131,280 | 14.8 | 10 | 9,800 | 24.5 | 7 | 31,860 | 31.2 | 10 |
| Fall to lower level | 55,860 | 5.4 | 16 | 46,160 | 5.2 | 16 | 2,420 | 6.1 | 14 | 7,290 | 7.1 | 14 |
| Exposure to harmful substances or environments | 51,010 | 5.0 | 4 | 39,510 | 4.5 | 4 | 2,400 | 6.0 | 6 | 9,100 | 8.9 | 6 |
| Contact with objects or equipment | 261,890 | 25.5 | 5 | 227,840 | 25.7 | 5 | 8,330 | 20.9 | 6 | 25,920 | 25.4 | 6 |
| Struck by object or equipment | 146,940 | 14.3 | 5 | 127,880 | 14.5 | 5 | 4,590 | 11.5 | 6 | 14,470 | 14.2 | 6 |
| Struck against object or equipment | 63,000 | 6.1 | 6 | 53,010 | 6.0 | 6 | 2,410 | 6.0 | 7 | 7,580 | 7.4 | 6 |
| Caught in or compressed by object or equipment | 38,030 | 3.7 | 10 | 35,090 | 4.0 | 10 | 810 | 2.0 | 6 | 2,130 | 2.1 | 5 |
| Overexertion and bodily reaction | 408,760 | 39.8 | 12 | 331,130 | 37.4 | 12 | 19,780 | 49.6 | 15 | 57,850 | 56.7 | 12 |
| Overexertion in lifting or lowering | 127,840 | 12.4 | 11 | 106,210 | 12.0 | 10 | 4,910 | 12.3 | 17 | 16,730 | 16.4 | 17 |
| Repetitive motion involving microtasks | 30,310 | 3.0 | 23 | 25,500 | 2.9 | 23 | 1,700 | 4.3 | 19 | 3,110 | 3.0 | 25 |
| All other event or exposures | 12,990 | 1.3 | 16 | 9,370 | 1.1 | 11 | 2,340 | 5.9 | 36 | 1,280 | 1.3 | 8 |

14

See footnotes at end of table.

TABLE 5. Number, incidence rate[1], and median days away from work[2] for nonfatal occupational injuries and illnesses involving days away from work[3] by injury or illness characteristics and ownership, 2012 — Continued

| Characteristic | Total private, State, and local government | | | Private industry[4,5,6] | | | State government[5,6] | | | Local government[4,5,6] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Incidence rate | Median days away from work | Number | Incidence rate | Median days away from work | Number | Incidence rate | Median days away from work | Number | Incidence rate | Median days away from work |
| **Part of body affected by the injury or illness:** | | | | | | | | | | | | |
| Head | 80,910 | 7.9 | 3 | 65,320 | 7.4 | 3 | 4,270 | 10.7 | 4 | 11,320 | 11.1 | 3 |
| Eye(s) | 23,830 | 2.3 | 2 | 20,300 | 2.3 | 2 | 880 | 2.2 | 3 | 2,650 | 2.6 | 2 |
| Neck | 16,430 | 1.6 | 8 | 12,490 | 1.4 | 8 | 1,270 | 3.2 | 10 | 2,680 | 2.6 | 7 |
| Trunk | 286,060 | 27.9 | 8 | 233,340 | 26.4 | 8 | 13,570 | 34.0 | 9 | 39,150 | 38.4 | 8 |
| Back | 217,660 | 21.2 | 7 | 177,580 | 20.1 | 7 | 10,220 | 25.6 | 10 | 29,860 | 29.3 | 8 |
| Upper extremities | 347,590 | 33.8 | 10 | 285,680 | 32.3 | 10 | 16,680 | 41.8 | 13 | 45,230 | 44.3 | 11 |
| Shoulder | 87,130 | 8.5 | 24 | 68,090 | 7.7 | 24 | 4,540 | 11.4 | 30 | 14,490 | 14.2 | 25 |
| Arm | 52,120 | 5.1 | 11 | 41,230 | 4.7 | 11 | 2,030 | 5.1 | 11 | 8,860 | 8.7 | 9 |
| Wrist | 46,760 | 4.6 | 15 | 38,230 | 4.3 | 16 | 2,020 | 5.1 | 15 | 6,520 | 6.4 | 11 |
| Hand | 140,070 | 13.6 | 5 | 121,580 | 13.7 | 5 | 5,490 | 13.8 | 8 | 12,990 | 12.7 | 6 |
| Lower extremities | 259,610 | 25.3 | 12 | 200,110 | 22.6 | 12 | 15,450 | 38.7 | 12 | 44,050 | 43.2 | 11 |
| Knee | 105,340 | 10.3 | 14 | 76,960 | 8.7 | 15 | 7,950 | 19.9 | 13 | 20,430 | 20.0 | 6 |
| Ankle | 76,680 | 7.5 | 9 | 43,870 | 5.0 | 8 | 2,960 | 7.4 | 17 | 20,150 | 20.0 | 11 |
| Foot | 49,530 | 4.8 | 8 | 41,620 | 4.7 | 9 | 1,870 | 4.7 | 6 | 6,040 | 5.9 | 6 |
| Body systems | 25,520 | 2.5 | 9 | 17,590 | 2.0 | 4 | 2,080 | 5.2 | 8 | 5,850 | 5.7 | 5 |
| Multiple | 125,970 | 12.3 | 10 | 82,900 | 9.4 | 9 | 11,830 | 29.6 | 9 | 31,240 | 30.6 | 9 |
| All other parts of body | 11,880 | 1.2 | 11 | 8,270 | .9 | 8 | 1,800 | 4.5 | 36 | 1,820 | 1.8 | 5 |
| **Source of injury or illness:** | | | | | | | | | | | | |
| Chemicals and chemical products | 13,680 | 1.3 | 3 | 11,560 | 1.3 | 3 | 530 | 1.3 | 3 | 1,600 | 1.6 | 2 |
| Containers | 120,420 | 11.7 | 10 | 106,010 | 12.0 | 10 | 3,430 | 8.6 | 12 | 10,980 | 10.8 | 12 |
| Furniture and fixtures | 48,820 | 4.8 | 9 | 37,460 | 4.2 | 7 | 2,530 | 6.3 | 10 | 8,830 | 8.7 | 10 |
| Machinery | 59,280 | 5.8 | 9 | 53,000 | 6.0 | 8 | 1,460 | 3.7 | 7 | 4,790 | 4.7 | 10 |
| Parts and materials | 92,960 | 9.0 | 8 | 82,760 | 9.4 | 9 | 2,460 | 6.2 | 13 | 7,050 | 6.9 | 10 |
| Person, injured or ill worker | 180,080 | 17.5 | 7 | 136,360 | 15.4 | 13 | 11,450 | 28.7 | 14 | 32,260 | 31.6 | 13 |
| Worker motion or position | 169,990 | 16.6 | 7 | 129,470 | 14.6 | 7 | 10,560 | 26.5 | 7 | 29,950 | 29.4 | 13 |
| Person, other than injured or ill worker | 113,880 | 11.1 | 7 | 67,770 | 7.7 | 7 | 16,940 | 42.4 | 14 | 29,170 | 28.6 | 13 |
| Patient | 65,810 | 6.4 | 8 | 49,600 | 5.6 | 7 | 9,150 | 22.9 | 8 | 7,050 | 6.9 | 9 |
| Floors, walkways, ground surfaces | 186,630 | 18.2 | 10 | 141,560 | 16.0 | 11 | 11,250 | 28.2 | 7 | 34,020 | 33.4 | 10 |
| Handtools | 46,690 | 4.5 | 4 | 40,760 | 4.6 | 4 | 580 | 1.5 | 13 | 4,580 | 4.5 | 5 |
| Ladder | 22,590 | 2.2 | 15 | 20,510 | 2.3 | 15 | 250 | .6 | 13 | 1,830 | 1.8 | 13 |
| Vehicles | 112,480 | 11.0 | 10 | 87,430 | 9.9 | 10 | 5,290 | 13.2 | 10 | 19,760 | 19.4 | 10 |
| Trucks | 26,280 | 2.6 | 16 | 22,850 | 2.6 | 16 | 400 | 1.0 | 10 | 3,040 | 3.0 | 14 |
| Cart, dolly, hand truck nonpowered | 14,380 | 1.4 | 16 | 12,640 | 1.4 | 10 | 670 | 1.7 | 16 | 1,060 | 1.0 | 7 |
| All other sources | 156,980 | 15.3 | 6 | 120,520 | 13.6 | 5 | 10,000 | 25.1 | 13 | 26,470 | 25.9 | 7 |

[1] Incidence rates represent the number of injuries and illnesses per 10,000 full-time workers and were calculated as: (N/EH) x 20,000,000 where

N = number of injuries and illnesses
EH = total hours worked by all employees during the calendar year

20,000,000 = base for 10,000 equivalent full-time workers (working 40 hours per week, 50 weeks per year)

[2] Median days away from work is the measure used to summarize the varying lengths of absences from work among the cases with days away from work. Half the cases involved more days and half involved less days than a specified median. Median days away from work are represented in actual values.

[3] Days-away-from-work cases include those that resulted in days away from work, some of which also included job transfer or restriction.

[4] Excludes farms with fewer than 11 employees.

[5] Data for Mining (Sector 21 in the North American Industry Classification System— United States, 2007) include establishments not governed by the Mine Safety and Health Administration rules and reporting, such as those in Oil and Gas Extraction and related support activities. Data for mining operators in coal, metal, and nonmetal mining are provided to BLS by the Mine Safety and Health Administration, U.S. Department of Labor. Independent mining contractors are excluded from the coal, metal, and nonmetal mining industries. These data do not reflect the changes the Occupational Safety and Health Administration made to its recordkeeping requirements effective January 1, 2002; therefore, estimates for these industries are not comparable to estimates in other industries.

[6] Data for employers in rail transportation are provided to BLS by the Federal Railroad Administration, U.S. Department of Transportation.

[7] Musculoskeletal disorders (MSDs) include cases where the nature of the injury or illness is pinched nerve; herniated disc; meniscus tear; sprains, strains, tears; hernia (traumatic and nontraumatic); pain, swelling, and numbness; carpal or tarsal tunnel syndrome; Raynaud's syndrome or phenomenon; musculoskeletal system and connective tissue diseases and disorders, when the event or exposure leading to the injury or illness is overexertion and bodily reaction, unspecified; overexertion involving outside sources; repetitive motion involving microtasks; other and multiple exertions of bodily reactions; rubbed, abraded, or jarred by vibration.

NOTE: Dash indicates data do not meet publication guidelines. Because of rounding and data exclusion of nonclassifiable responses, data may not sum to the totals.

SOURCE: Bureau of Labor Statistics, U.S. Department of Labor, Survey of Occupational Injuries and Illnesses in cooperation with participating State agencies.

# EXHIBIT E

UNITED STATES
DEPARTMENT OF LABOR

SEARCH

A to Z Index | En español | Contact Us | FAQs | About OSHA
Was this page helpful?

OSHA

OSHA QuickTakes Newsletter    RSS Feeds    Print This Page    Text Size

Occupational Safety & Health Administration    We Can Help

What's New | Offices

Home    Workers    Regulations    Enforcement    Data & Statistics    Training    Publications    Newsroom
Small Business

OSHA

<< Back to OSHA Technical Manual (OTM) Table of Contents

# OSHA Technical Manual (OTM)
## Section II: Chapter 2 [Updated 6/24/2008 (08-05 (TED 01))]

Effective Date: 1/20/1999
Directive Number: TED 01-00-015 [TED 1-0.15A]

TOC | Abstract | Chapter 1 | Chapter 2 | Chapter 3 | Chapter 4

## OCCUPATIONAL SKIN EXPOSURE

  I. Introduction
 II. Basics of Skin Exposure
III. Risk Assessment (Establishing a Significant Risk of Skin Exposure)
 IV. Biological Monitoring
  V. Wipe Sampling Methodology
 VI. Enforcement Recommendations
VII. References

      Appendix II: 2-1. General Procedure for Collecting Wipe Samples

### I. INTRODUCTION

The purpose of this chapter is to provide guidance to OSHA Compliance Safety and Health Officers (CSHOs) and to the industrial hygiene community on the potential for skin exposure to chemicals in the workplace and the available means of assessing the extent of skin exposure. Skin exposure to chemicals in the workplace is a significant problem in the United States. Both the number of cases and the rate of skin diseases in the U.S. exceed recordable respiratory illnesses. In 2006, 41,400 recordable skin diseases were reported by the Bureau of Labor Statistics (BLS) at a rate of 4.5 injuries per 10,000 employees, compared to 17,700 respiratory illnesses with a rate of 1.9 illnesses per 10,000 employees.[1]

In addition to causing skin diseases, many chemicals that are readily absorbed through the skin can cause other health effects and contribute to the dose absorbed by inhalation of the chemical from the air. Skin absorption can occur without being noticed by the employee and in some instances may be a more significant route of exposure than the respiratory system. This is particularly true for non-volatile chemicals that are hazardous and which remain on work surfaces for long periods of time. The number of occupational illnesses caused by skin absorption of chemicals is not known. It is, however, argued that of an estimated 60,000 deaths and 860,000 occupational illnesses per year in the U.S. attributed to occupational exposure, even a relatively small percentage caused by skin exposure would represent a significant health risk.[2]

### II. BASICS OF SKIN EXPOSURE

Skin contact with chemicals can result in irritation, allergic response, chemical burns, and allergic contact dermatitis. Irritant dermatitis may be caused by a variety of substances such as strong acids and bases. Some examples of chemicals which are potent irritants include: ammonia, hydrogen chloride, and sodium hydroxide. Generally, primary irritants produce redness of the skin shortly after exposure with the extent of damage to the tissue being related to the relative irritant properties of the chemical. In most instances, the symptoms of primary irritation are observed shortly after exposure; however, some chemicals produce a delayed irritant effect because the chemicals are absorbed through the skin and then undergo decomposition with aqueous portions of the skin to produce primary irritants. Ethylene oxide, epichlorohydrin, hydroxylamines, and the chemical mustard agent (bis(2-chloroethylsulfide)) are classic examples of chemicals which must first decompose in the aqueous layers of the skin to produce irritation.

Allergic contact dermatitis, unlike primary irritation, is caused by chemicals which sensitize the skin. This condition is usually caused by repeated exposure of the skin to a relatively low concentration chemical which ultimately results in an irritant response. Frequently, the sensitized area of skin is well defined, providing an indication of the area of the skin which has been in contact with the sensitizing material.

A wide variety of both organic and inorganic chemicals can produce contact dermatitis. Some examples of these chemicals include: aromatic nitro compounds (e.g., 2,4-dinitrochlorobenzene), diphenols (e.g., hydroquinone, resorcinol), hydrazines and phenylhydrazines, piperazines, acrylates, aldehydes, aliphatic and aromatic amines, epoxy resins, many other organic chemicals, and metals (e.g., hexavalent chromium). These substances can also produce contact sensitization. Allergic contact dermatitis is present in virtually every industry, including agriculture, chemical manufacturing, rubber industry, wood, painting, bakeries, pulp and paper mills, and many others.

Lastly, there is a class of chemicals which can produce allergic reactions on the skin after exposure to sunlight or ultraviolet (UV) light. These chemicals are called photosensitizers. Polynuclear aromatic compounds from coke ovens and the petroleum-based tars are examples of chemicals which can be photoactivated on the skin to cause an irritant response.

#### A. *Skin Absorption*

In addition to the effects that chemicals can directly have on the skin, the skin also acts as a pathway for chemicals to be absorbed into the body. The skin primarily consists of two layers - the epidermis and the dermis. The outer layer of the epidermis is composed of a compacted layer of dead epidermal cells called the stratum corneum which is approximately 10 – 40 micrometers thick. The stratum corneum is the primary barrier for protection against chemical penetration into the body. Its chemical composition is approximately 40% protein, 40% water, and 20% lipid or fat. Because skin cells are constantly being produced by the body, the stratum corneum is replaced by the body approximately every two weeks.

Chemical absorption through the stratum corneum occurs by a passive process in which the chemical diffuses through this dead skin barrier. Estimates of the

# EXHIBIT F



U.S. National Library of Medicine
*NIH* National Institutes of Health

URL of this page: http://www.nlm.nih.gov/medlineplus/ency/article/000059.htm

# Chemical burn or reaction

Chemicals that touch skin can lead to a reaction on the skin, throughout the body, or both.

## Considerations

Chemical exposure is not always obvious. You should suspect chemical exposure if an otherwise healthy person becomes ill for no apparent reason, particularly if an empty chemical container is found nearby.

Exposure to chemicals at work over a long period of time can cause changing symptoms as the chemical builds up in the person's body.

If the person has a chemical in the eyes, see first aid for eye emergencies.

If the person has swallowed or inhaled a dangerous chemical, call a local poison control at 1-800-222-1222.

## Symptoms

Depending on the type of exposure, the symptoms may include:

- Abdominal pain
- Breathing difficulty
- Bright red or bluish skin and lips
- Convulsions (seizures)
- Dizziness
- Headache
- Hives, itching, swelling, nausea, vomiting, or weakness resulting from an allergic reaction
- Irritability
- Pain where the skin has come in contact with the toxic substance
- Rash, blisters, burns on the skin
- Unconsciousness

## First Aid

- Make sure the cause of the burn has been removed. Try not to come in contact with it yourself. If the chemical is dry, brush off any excess. Avoid brushing it into your eyes. Remove any contaminated clothing or jewelry.
- Flush the chemicals off the skin surface using cool running water for 15 minutes or more.
- Treat the person for shock if he or she appears faint, pale, or if there is shallow, rapid breathing.
- Apply cool, wet compresses to relieve pain.
- Wrap the burned area with a dry sterile dressing (if possible) or clean cloth. Protect the burned area from pressure and friction.

1:13-CV-01177 (RMC)

EXHIBIT G

# Psychiatric Diagnoses After Hospitalization With Work-Related Burn Injuries in Washington State

Naomi J. Anderson, MPH, David K. Bonauto, MD, MPH, Darrin Adams, BA

This study aims to describe workers who were hospitalized with work-related burn injuries and their psychiatric sequelae in Washington State. Psychiatric sequelae of interest were depression, posttraumatic stress disorder, and other anxiety disorders. Workers' compensation claims meeting a definition for a hospitalized burn patient from Washington State from January 2001 through April 2008 were analyzed. The resulting claims were searched for the presence of certain psychiatric diagnoses or treatment codes, and descriptive analyses performed. In Washington State during the time period, the prevalence of claims with psychiatric diagnoses after hospitalization with burn injury was 19%. Claims with psychiatric diagnoses had higher medical costs and more days of time loss than those without these diagnoses. Workers with electrical burns in the construction industry and in construction and extraction occupations had a higher proportion of psychiatric sequelae. Burns are devastating yet preventable injuries. Workers who were hospitalized with work-related burn injuries, particularly those in certain industries and occupations and those with electrical burns, are at high risk for developing serious psychiatric sequelae with major costs to both the individual and the society. (J Burn Care Res 2011;32:369–378)

Work-related burn injuries are a serious public health problem. A recent estimate put the number of workers with work-related burn injuries occurring in the United States each year at 183,000 (42.1% of all burns).[1] Burn injuries can have a wide range of consequences from physical pain, disablement, and scarring, to economic problems such as a delay in return to work (RTW); severe burns that require hospitalization can be even more troublesome. One study found that only 37% of workers who were hospitalized with work-related burn injuries were able to return to employment within 2 years at the same job without accommodation.[2]

From the Safety and Health Assessment and Research for Prevention (SHARP) Program, Department of Labor and Industries, Olympia, Washington.

Supported by grant 5U60OH008487 from CDC—NIOSH and collection of data from the University of Washington Burn Center was supported by funds from the National Institute on Disability and Rehabilitation Research in the Office of Special Education and Rehabilitative Services in the US Department of Education.

Address correspondence to Naomi J. Anderson, MPH, Safety and Health Assessment and Research for Prevention Program, Department of Labor and Industries, PO Box 44330, Olympia, Washington 98504-4330.

Copyright © 2011 by the American Burn Association.
1559-047X/2011

DOI: 10.1097/BCR.0b013e318217f83a

Patients hospitalized with burns typically make up only a small fraction of burn injury cases. Among accepted claims in the Washington State workers' compensation (WC) state fund (SF) between January 1, 2001, and April 30, 2008, there were almost 20,000 burn claims, but only 329 of these included hospitalization. Despite being a very small percentage of all burn cases, burns involving hospitalization are very expensive—although patients hospitalized with burns were just 1.7% of all burns cases within WC, they accounted for 51% of the WC claim costs for work-related burns. Mental disorders and psychological distress are one of the common sequelae of burn injuries. Anxiety and depression,[3–10] emotional distress,[10] acute stress disorder,[11] posttraumatic stress disorder (PTSD),[5,11–15] and general psychosocial problems[15] are common issues facing burn survivors.

Survivors of burn injuries face an increased risk of psychological disorders, with recent estimates of a lifetime prevalence of PTSD in the general population to be 9.2%[16]; in survivors of burn injury, prevalence estimates vary from 8 to 45%.[7,10,13] For depression, data from the 2005 to 2006 National Health and Nutrition Examination Survey[17] showed 5.4% (in past 2 years) in the general population, whereas for survivors of burn injury, it varied widely from 7 to 55% depending on sample, follow-up points, and in-

Copyright © American Burn Association. Unauthorized reprod          ed.
1:13-CV-01177 (RMC)

Journal of Burn Care & Research
May/June 2011

374   *Anderson, Bonauto, and Adams*

than 30 days on the job (6 and 5, respectively) and the most with <5 days on the job (3 and 2, respectively).

## Injury Characteristics

Body part, type of burn, and %TBSA burned had significantly different distributions in hospitalized burn patients between those who had psychiatric diagnoses and those without psychiatric diagnoses (Table 2). Overall, the majority of patients hospitalized with burns had "multiple" body parts injured, 67.7% of the claims with psychiatric diagnosis and 45.6% of those without psychiatric diagnoses. For those without psychiatric diagnosis, this was followed by burns to the upper extremity (25.7%) and lower extremity (21.9%); for those who had a psychiatric diagnosis, however, "Multiple" was followed by burns to the upper extremity (12.9%) and head/face (8.1%). Of all workers who had "head/face" burns, 27.7% had a psychiatric diagnosis, which was the highest percentage of all the body parts, comparable only with "Multiple" (25.7%).

The type of burn also proved significant ($P = .0001$), with 57.1% of electrical burns leading to psychiatric diagnoses, despite making up only 8.5% of the 329 cases resulting in hospitalization. Twenty-six percent (26%) of chemical burns led to psychiatric diagnosis, although

making up 10.3% of the burns; whereas in thermal burns, by far the most common type of burn overall (80.2% of all), only 13.6% received a psychiatric diagnosis.

Burns with greater than 10% TBSA also showed an increased proportion of psychiatric sequelae. Of cases where TBSA was available in the records (n = 227), 30% of all burns with >10% TBSA had a psychiatric diagnosis, making up 67% of all cases with psychiatric diagnosis.

## Costs

The total medical cost of all 329 cases of patients hospitalized with burns was $11,872,089. Cases of hospitalized burn patients with psychiatric diagnoses (n = 62) made up 48% of the total cost ($5,720,194). The median number of days of time loss for all 329 claims was 33 days. Because the greater severity of burns with greater than 10% TBSA could in itself necessitate greater medical costs and more days of time loss, they were grouped by less than 10 and 10% or greater for analysis (Table 3).

Medical costs were significantly different ($P = .0001$) between claims with and without psychiatric diagnosis at both levels of TBSA, with those with greater than 10% TBSA and a psychiatric diagnosis having a median medical cost seven times that of

**Table 3.** Time loss and medical costs of patients hospitalized with work-related burns among accepted claims in the Washington State workers' compensation state fund, January 1, 2001 to April 30, 2008

| | No Psychiatric Diagnosis*, n (%) | With Psychiatric Diagnosis, n (%) | P† | All, n (%) |
|---|---|---|---|---|
| N | 182 (80.2) | 45 (19.8) | | 227 (100) |
| Medical costs ($) | | | | |
| TBSA‡ <10 | | | | |
| n (%) | 113 (62.1) | 15 (33.3) | 0.0001 | 128 (56.4) |
| Median | 10,346 | 36,719 | | 11,286 |
| Q1–Q3 | 7,624–20,086 | 17,196–85,074 | | 7,742–23,113 |
| TBSA ≥ 10 | | | | |
| n (%) | 69 (37.9) | 30 (66.7) | 0.0001 | 99 (43.6) |
| Median | 12,724 | 98,478 | | 21,231 |
| (Q1–Q3) | 8,506–26,455 | 49,295–146,499 | | 9,030–50,308 |
| Time loss (d) | | | | |
| TBSA‡ <10 | | | | |
| n (%) | 113 (62.1) | 15 (33.3) | 0.06 | 128 (56.4) |
| Median | 30 | 145 | | 30 |
| Q1–Q3 | 14–51 | 23–622 | | 14–61 |
| TBSA ≥ 10 | | | | |
| n (%) | 69 (37.9) | 30 (66.7) | 0.0001 | 99 (43.6) |
| Median | 32 | 300 | | 45 |
| Q1–Q3 | 17–53 | 81–956 | | 20–141 |

* See Table 1 for complete list of included diagnoses.
† Wilcoxon test.
‡ TBSA burned (%).

Copyright © American Burn Association. Unauthorized reproduction

1:13-CV-01177 (RMC)

# EXHIBIT H



# NATIONAL OCCUPATIONAL RESEARCH AGENDA

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Public Health Service
Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

DHHS (NIOSH) Publication No. 96-115

April 1996

## CONTENTS

- Foreword
- Executive Summary
- Introduction
- National Occupational Research Agenda (NORA) Priority Research Areas
  - Disease and Injury (Overview)
    - Allergic and Irritant Dermatitis
    - Asthma and Chronic Obstructive Pulmonary Disease
    - Fertility and Pregnancy Abnormalities
    - Hearing Loss
    - Infectious Diseases
    - Low Back Disorders
    - Musculoskeletal Disorders of the Upper Extremities
    - Traumatic Injuries
  - Work Environment and Workforce (0verview)
    - Emerging Technologies
    - Indoor Environment
    - Mixed Exposures
    - Organization of Work
    - Special Populations at Risk
  - Research Tools and Approaches (Overview)
    - Cancer Research Methods
    - Control Technology and Personal Protective Equipment
    - Exposure Assessment Methods
    - Health Services Research
    - Intervention Effectiveness Research
    - Risk Assessment Methods
    - Social and Economic Consequences of Workplace Illness and Injury
    - Surveillance Research Methods
  - Selected Bibliography

1:13-CV-01177 (RMC)

# NORA PRIORITY RESEARCH AREAS

## Disease and Injury

-
- **Allergic and Irritant Dermatitis**
- **Asthma and Chronic Obstructive Pulmonary Disease**
- **Fertility and Pregnancy Abnormalities**
- **Hearing Loss**
- **Infectious Diseases**
- **Low Back Disorders**
- **Musculoskeletal Disorders of the Upper Extremities**
- **Traumatic Injuries**

Eight of the 21 priority research areas are grouped in the category of adverse health effects--namely, disease and injury. An earlier effort by NIOSH in the 1980s identified the "top ten" leading workplace diseases and injuries. In the development of NORA, participants recognized the need to include a list of diseases and injuries (albeit updated and more focused than the "top ten") and to include research areas grouped into two other broad categories: work environment and workforce, and research tools and approaches.

Early in the process, many disease and injury topics were offered for potential inclusion in NORA. Obviously, a list of significant workplace diseases and injuries could easily be many times the size of the list presented in the Agenda. Working groups performed the difficult task of refining and prioritizing to achieve this list of eight topics--topics for which concerted research efforts have the potential to improve the well-being of large numbers of workers and their families. Indeed, significant advances in the prevention of diseases or injuries encompassed by these eight areas would improve the health of millions of U.S. workers and save billions of dollars in costs related to medical treatment and lost productivity.

 **NORA Table of Contents**

## Allergic and Irritant Dermatitis

Allergic and irritant dermatitis (contact dermatitis) is overwhelmingly the most important cause of occupational skin diseases, which account for 15% to 20% of all reported occupational diseases. There is virtually no occupation or industry without potential exposure to the many diverse agents that cause allergic and irritant dermatitis. Research is needed to better identify the prevalence, causes, exposure assessment methods, and early biologic markers of this ubiquitous condition.

1:13-CV-01177 (RMC)

## Importance

In the workplace, the skin is an important route of exposure to chemicals and other contaminants. According to the

U.S. Bureau of Labor Statistics, occupational skin diseases--mostly in the form of allergic and irritant (contact) dermatitis--are the second most common type of occupational disease. From 1983 to 1994, the rate of occupational skin diseases increased from 64 to 81 cases per 100,000 workers. In 1994, there were approximately 66,000 reported cases of occupational skin diseases, accounting for about 13% of all occupational diseases. Moreover, occupational skin diseases are believed to be severely underreported, such that the true rate of new cases may be many fold higher than documented. These data stress that the national objective for reducing the rate of new cases of occupational skin diseases to 55 per 100,000 workers (as set by *Healthy People 2000 )* is far from being met.

Estimated total annual costs (including lost workdays and loss of productivity associated with occupational skin diseases) may reach $1 billion annually. Workers' compensation claims rates for occupational skin diseases vary by State and range from 12 to 108 per 100,000 workers per year. Self-reported occupational dermatitis prevalence in the 1988 National Health Interview Survey was nearly 2% (1,700 cases per 100,000 workers).

Irritant contact dermatitis is the most common occupational skin disease, usually resulting from toxic reactions to chemical irritants such as solvents and cutting fluids. Allergic dermatitis is estimated to constitute about 20% to 25% of all contact dermatitis; it is caused by a wide variety of substances such as latex and some pesticides that trigger an allergic (delayed hypersensitivity) reaction. Contact urticaria (hives occurring soon after an allergen or irritant contacts the skin) is considered here also because it may evolve into contact dermatitis. A number of substances may cause both irritant and allergic dermatitis as well as contact urticaria. For example, latex (which has been reported to cause skin disorders in up to 10% of exposed health care workers), most commonly causes irritant dermatitis but it also results in allergic contact dermatitis and, least commonly, contact urticaria.

Because the prognosis of occupational irritant and allergic dermatitis is poor, prevention is imperative. This fact is emphasized by one study showing that 75% of patients with occupational contact dermatitis developed chronic skin disease. With thousands of potentially harmful chemicals being introduced into the workplace each year, and with the threat of rapidly emerging skin diseases such as latex allergy, further research of irritant and allergic contact dermatitis is greatly needed.

## Research Opportunities

Just as the plight of news reporters with carpal tunnel syndrome captured public attention, disability occurring among nurses and other health care workers allergic to latex is now capturing the attention of health scientists. There has been relatively little occupational research to evaluate causes of occupational dermatitis, identify high risk occupations, develop interventions to protect workers, or assist workers who have developed skin diseases that commonly afflict them for the rest of their lives. Despite a high rate of dermatitis among agricultural workers and high numbers of cases in manufacturing, there is little research to identify and target the most important causes. Also needed are new laboratory *in vitro* skin models, improved statistical models for pharmacokinetic testing in animals, and improved field methods to measure permeation of skin by individual substances and mixtures. The lack of adequate tools prevents the next step in research which aims to eliminate

1:13-CV-01177 (RMC)

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREVOR,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:11-CV-01187 (RMC)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF DAN KIRKWOOD

I, Dan Kirkwood, declare as follows:

1.     I currently serve as the Health & Safety Manager for Alcoa's Wagerup plant located in Western Australia. Wagerup supplies alumina to Alcoa's smelters and external customers for the production of aluminum. I have worked in the capacity of Health and Safety Manager for Alcoa's health and safety group for the past 27 years.

2.     Alcoa uses the Diphoterine Skin Wash ("DSW") at the Wagerup plant, as well as at other facilities in Australia, Latin America, and Jamaica, to protect workers and contractors from chemical burns and related injuries. If an individual's skin, face, eye, or mouth is exposed to a chemical, the DSW is used to immediately wash off the chemical through a pressurized spray and neutralize the caustic or acid.

3.     Alcoa uses several DSW products at the Wagerup plant. First, all employees and contractors are required to carry a 100 ml canister with them at all times. Second, the plant also has stand-alone DSW containers in its Medical Centre and Security so that, if there is a large chemical exposure, additional DSW is available. The DSW products are

used in the event of a chemical exposure before the employee would proceed to an onsite safety shower to further wash off the chemical from the worker's skin.

4.      Wagerup's experience with the DSW products has been extremely positive.  The DSW is very easy to use and effective.  There have been numerous instances where an individual has applied the DSW immediately following a chemical exposure and prevented any visible chemical burn.  We have had accidents where chemicals entered a worker's eye and the DSW was successful in eliminating or minimizing the need for further treatment.  Whilst I have never had the need to use the DSW, my emergency response people do and have advised me that when they have used DSW on a patient the results they see are outstanding.  They see the effect as DSW is applied, as the redness of a chemical burn starts to disappear.

5.      Wagerup is unaware of any comparable device that is as easy to use and effective as the DSW at washing off and neutralizing chemicals.  If DWS were not available it would have a negative impact on the safety and treatment of our employees and contractors, were they to come into contact with or be contacted by a chemical, as well as increase medical costs and expenses incurred by the company.

        In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on January 25th, 2012

                    D.F. Kirkwood

                    Dan Kirkwood

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PREVOR,                        )<br><br>Plaintiff,        )<br><br>v.                   )<br><br>UNITED STATES FOOD AND DRUG  )<br>ADMINISTRATION,         )<br><br>Defendant.    )| Case No. 1:13-CV-01177 (RMC) |

## DECLARATION OF JENNIFER SCHUMAKER

I, Jennifer Schumaker, RN, declare as follows:

1.     I am currently the Occupational Nurse at Alcoa's alumina plant located in Point Comfort, Texas. I have served in that position since February 2008. My responsibilities include providing medical care to the plant's employees, including treating occupational injuries, such as chemical burns.

2.     The alumina manufacturing process places our employees in contact with various chemicals as a routine job function. We strive to avoid all hazardous chemical exposures, but accidents unfortunately do happen. As an on-site caregiver, my goal is to lessen the physical and psychological damages associated with chemical burns. I see the Diphoterine Skin Wash ("DSW") as one tool we could use to mitigate these injuries by avoiding tissue destruction at the time of exposure. DSW would allow employees, immediately after the accident, to wash the chemical off the skin through a pressurized spray and neutralize any remaining chemical.

1

3.      Chemical burns are traumatic events which can leave lasting scars in addition to physical injuries.  The repeated, intrusive, and painful medical procedures required to heal and, in some cases, survive a chemical burn can profoundly affect the employee, his/her work life, and the worker's family long after the accident.

4.      The following summarizes two recent chemical burn incidents at Point Comfort which show why our employees need access to DSW now.  In my opinion, these serious injuries would have been less severe if DSW had been available at our facility.

5.      On September 9, 2013, five workers were injured when they were sprayed with a caustic liquid while cleaning plant equipment.  Two employees received minor burns that required first aid treatment, while another had 1st and 2nd degree burns of the face, wrist, and scalp, which resulted in a referral to a burn specialist.  Two other workers, however, suffered substantial burns that have required extensive treatment and resulted in lost work days.  The first employee is a Production Supervisor who had 1st and 2nd degree burns over large areas, including his right arm, right leg, and torso.  He was hospitalized in a burn unit and then went through skin grafting and many painful treatment sessions.  His burns have required on-going outpatient treatment since being discharged from the hospital.  The second employee is an Area Operator who had significant burns over his chest and limbs.  He also has endured skin grafting and numerous painful treatments during an extended hospital stay at a burn unit many miles from his home.  He has had to continue outpatient treatments at the hospital.

6.      On October 24, 2013, a supervisor for a contractor was injured in the area of the plant where dissolved alumina is recovered from the plant process liquid.  The contractor suffered significant burns to his face, chest, back, hands, and arms.  He was taken by

2

helicopter to a burn unit and went through numerous painful skin grafts.  He continues to receive extensive outpatient treatment.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December  13 , 2013

*Jennifer Schumaker RN*

Jennifer Schumaker, RN

4840-8995-0743, v. 1

3