# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____
)
PREVOR,                                )
                                       )
              Plaintiff,    )
                                       )   Case No.  1:13-cv-01177 (RMC)
      v.                     )
                                       )
UNITED STATES FOOD AND DRUG            )
ADMINISTRATION,                        )
                                       )
             Defendant.    )
_____)


# DEFENDANT'S REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iiii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

   I.   The Device Exclusionary Clause Is Ambiguous and FDA's Interpretation Is a
       Permissible Construction ........................................................................................... 3

      A.  The Device Exclusionary Clause Is Ambiguous ........................................... 3

      B.  Prevor Wrongly Contends that that the Word "Achieve" Implies a Requirement
          that Chemical Action Be More Important than Other Actions or that Chemical
          Action Be the Sole Method of Action ............................................................ 4

      C.  FDA's Interpretation of the Level of Chemical Action Needed Is Permissible ........... 7

          1.  FDA Remedied the Issues Identified in *Prevor I* .................................... 8

          2.  FDA's Remand Decision Sets Forth a Reasoned Basis for the Agency's
             Interpretation ............................................................................................... 9

          3.  Scientific Constraints Support FDA's Interpretation ............................. 11

          4.  FDA Does Not Have the Burden to Refute Prevor's Recommended
             Classification ............................................................................................. 13

   II.  The Scientific Evidence Supports FDA's Determination .................................... 14

   III. FDA's Past Practice Is Consistent with Its Treatment of Diphoterine Skin Wash ............ 17

      A.  Medical Maggots and Reactive Skin Decontamination Lotion .................. 17

      B.  Similar Past Precedent ................................................................................ 19

   IV. Prevor's Requested Relief Is an Ill-Disguised Attempt to have the Court Make
       Scientific Determinations .......................................................................................... 21

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

## Federal Cases

**Page(s)**

*Actavis Elizabeth LLC v. FDA,*
  689 F.Supp.2d 174 (D.D.C. 2010) ................................................................... 16, 22

*Allergan, Inc. v. Crawford,*
  398 F. Supp. 2d 13 (D.D.C. 2005) ..................................................................... 4

*Alpharma, Inc. v. Leavitt,*
  460 F.3d 1 (D.C. Cir. 2006) ............................................................................ 21

*Apotex, Inc. v. FDA,*
  No. Civ. A. 06-0627, 2006 WL 1030151 (D.D.C. April 19, 2006) ......................... 9

*Barnhart v. Walton,*
  535 U.S. 212 (2002) ...................................................................................... 8

*Bennett v. Donovan,*
  703 F.3d 582 (D.C. Cir. 2013) ........................................................................ 23

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ............................................................................ 3, 4, 8, 12

*Cook v. FDA,*
  733 F.3d 1 (D.C. Cir. 2013) ............................................................................ 2

*Ctr. for Biological Diversity v. Jackson,*
  815 F. Supp. 2d 85 (D.D.C. 2011) ................................................................... 4

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...................................................................................... 23

*Florida Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ...................................................................................... 23

*Food Mktg. Inst. v. Interstate Commerce Comm'n,*
  587 F.2d 1285 (D.C. Cir. 1978)........................................................................ 2

*Goldstein v. SEC,*
  451 F.3d 873 (D.C. Cir. 2006) ........................................................................ 11

*Menkes v. U.S. Dep't of Homeland Sec.,*
   637 F.3d 319 (D.C. Cir. 2011) ........................................................................ 4

*Mount Royal Joint Venture v. Kempthorne,*
   477 F.3d 745 (D.C. Cir. 2007); ...................................................................... 4

*Mylan Labs. Inc. v. Thompson,*
   389 F.3d 127 (D.C. Cir. 2004) ........................................................................ 4

*Natural Res. Def. Council v. EPA,*
   489 F.3d 1364 (D.C. Cir. 2007) .................................................................... 11

*N. Air Cargo v. U.S. Postal Serv.,*
   674 F.3d 852 (D.C. Cir. 2012) ...................................................................... 23

*PDK Labs., Inc. v. DEA,*
   362 F.3d 786 (D.C. Cir. 2004) ...................................................................... 12

*Prevor v. FDA,*
   895 F. Supp. 2d 90 (D.D.C. 2012) ........................................................... *passim*

*Rempfer v. Sharfstein,*
   583 F.3d 860 (D.C. Cir. 2009) ................................................................ 15, 22

*Serono Labs., Inc. v. Shalala,*
   158 F.3d 1313 (D.C. Cir. 1998) .............................................................. 15, 22

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ....................................................................................... 4

*Teva Pharm. USA, Inc. v. FDA,*
   441 F.3d 1 (D.C. Cir. 2006) ...................................................................... 9, 11

*Troy Corp. v. Browner,*
   120 F.3d 277 (D.C. Cir. 1997) ...................................................................... 22

*Tummino v. Hamburg,*
   936 F. Supp. 2d 162 (E.D.N.Y. 2013) .......................................................... 21

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ....................................................................................... 4

*United States v. Western Serum Co., Inc.,*
   666 F.2d 335 (9th Cir. 1982) ....................................................................... 23

*United States v. Generix Drug Corp.,*
  460 U.S. 453 (1983) ............................................................................................. 23

*United States v. Undetermined No. of Unlabeled Cases,*
  21 F.3d 1026 (10th Cir. 1994) ............................................................................. 23

*United States v. Regenerative Sciences, L.L.C.,*
  878 F. Supp. 248 (D.D.C. 2012) ......................................................................... 23

## Federal Statutes

21 U.S.C. § 321 ........................................................................................................... 3

21 U.S.C. § 353 ......................................................................................................... 10

21 U.S.C. § 355 .................................................................................................. 10, 13

21 U.S.C. § 360 ......................................................................................................... 13

21 U.S.C. § 360c ............................................................................................... 10, 13

21 U.S.C. § 360e ............................................................................................... 10, 13

21 U.S.C. § 360bbb-2 ...................................................................................... 13, 22

## Federal Regulations

21 C.F.R. Part 3 ......................................................................................................... 8

21 C.F.R. § 3.2 ......................................................................................................... 10

21 C.F.R. § 7.45 ....................................................................................................... 10

21 C.F.R. § 10.75 ..................................................................................................... 12

21 C.F.R. § 312.130 ................................................................................................. 20

21 C.F.R. § 314.430 ................................................................................................. 20

21 C.F.R. § 601.50 ................................................................................................... 20

21 C.F.R. § 807.95 ................................................................................................... 20

21 C.F.R. § 814.921 ................................................................................................. 20

**Federal Register**

70 Fed. Reg. 49,848 (Aug. 25, 2005)............................................................................................ 18

## <u>INTRODUCTION</u>

FDA permissibly interpreted the device exclusionary clause—which is silent with respect to the level of chemical action necessary to trigger exclusion—so that a product is not a device if chemical action meaningfully contributes to achieving its primary intended purposes.  FDA's interpretation is in keeping with (1) the statutory text, (2) scientific restraints, and (3) this Court's opinion in *Prevor v. FDA*, 895 F. Supp. 2d 90 (D.D.C. 2012) ("*Prevor I*").  It also fulfills FDA's responsibility to interpret ambiguous statutory language.

Unhappy that Diphoterine Skin Wash's solution is not a device under FDA's interpretation, Prevor advances alternative interpretations that it attempts to present as the statute's plain meaning:  that chemical action must be more important than other actions involved to trigger exclusion; or, that the primary intended purpose must be achieved solely by chemical action.  But Prevor's interpretations do not reflect the plain meaning of the statute.  Instead, they depend on adding words to resolve the statutory ambiguity regarding the degree to which chemical action must contribute.  Prevor's interpretation of ambiguous language cannot trump FDA's reasonable and permissible interpretation.

In addition, the scientific evidence fully supports FDA's conclusion that the Diphoterine solution's primary intended purpose of preventing and minimizing chemical burn injuries is achieved through chemical action.  Indeed, the record highlights the importance of the solution's chemical action in preventing and minimizing chemical burn injuries.  FDA's remand decision also explained why FDA's treatment of Diphoterine Skin Wash was consistent with past

precedent, following the Court's instruction to provide a reasoned explanation for assigning

Reactive Skin Decontamination Lotion and medical maggots to a different Center for review.[1]

Finally, Prevor attempts to distract from FDA's comprehensive explanation and

evaluation of the scientific evidence with a bevy of unpersuasive and, ultimately, irrelevant

arguments concerning everything from how many times FDA's remand decision references the

Court's opinion to who bears the burden of demonstrating a recommended product classification.

However, none of these arguments allow Prevor to prevail in the face of FDA's reasonable and

well-supported remand decision.[2]

---

[1] The Court should accord deference to FDA's statutory interpretation and scientific findings on remand because the record demonstrates that the agency engaged in a genuine reconsideration of the issues.  *See, e.g., Food Mktg. Inst. v. Interstate Commerce Comm'n*, 587 F.2d 1285, 1294 (D.C. Cir. 1978) (upholding agency decision after remand because, while reaching the same result, it was well-supported), *see also* Def.'s Br. at 11, 13, n.10, 23-24, 27-28.  The cases Prevor cites for the proposition that deference is inappropriate are inapposite.  Pl.'s Opp'n at 19-20, Pl.'s Br. 22-25.  Unlike those cases, FDA's remand decision reflects the agency's fair and considered judgment as evidenced by its analysis of voluminous science evidence, A.R. 839-59, and adopted a permissible interpretation supported by the statutory text and scientific constraints, *see supra* Section I.C.  In addition, *Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013), Pl.'s Opp'n at 19, n.19, is distinguishable because, there, the court found that the statute was unambiguous.  As explained, *see supra* Section I.A, the device exclusionary clause at issue here is ambiguous.  FDA's remand decision addresses the Court's concerns in *Prevor I*, *see infra* Section I.C.1 & Section III, and refuted Prevor's arguments, *see* A.R. 852-57.

[2] Prevor asserts that the government conceded arguments it supposedly did not address in its opening brief *see* Pl.'s Opp'n at 4, but fails to identify any such arguments.  That Prevor does not agree with the government's counterarguments does not mean the government made any concessions.

**ARGUMENT**

I.    **The Device Exclusionary Clause Is Ambiguous and FDA's Interpretation Is a Permissible Construction.**

    A.    **The Device Exclusionary Clause Is Ambiguous.**

The section of the "device" definition at issue here, *see* 21 U.S.C. § 321(h), is ambiguous. Specifically, the device exclusionary clause—"which does not achieve its primary intended purposes through chemical action within or on the body of man"—does not expressly identify the degree to which a product's primary intended purposes must be achieved through chemical action. *See* Def.'s Mem. in Supp. of its Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Br.") at 10-11; A.R. at 845-46.  Congress did not use a modifier such as "predominantly" or "solely" to indicate the level of chemical action necessary for a primary intended purpose to be "achieve[d] . . . through chemical action."  *Id.*

Despite its protests, Prevor's interpretations cannot be drawn from the statutory language without interposing additional words (*e.g.,* "predominately," "primarily," "chiefly," "solely," "independent of").  Thus, Prevor and FDA are both filling a gap in the statute in order to bring meaning to a demonstrably ambiguous provision.[3]  The difference is that FDA receives deference for its interpretation of the statute it administers.  *See Chevron*, 467 U.S. at 844.

---

[3] Prevor contends that its interpretation is reflected in the legislative history, *see* Pl.'s Opp'n at 8, however, it fails to cite any such history that Congress meant to require the primary intended purposes be achieved "solely" or "predominately" through chemical action.  Instead, Prevor cites to legislative history concerning changes that Congress described as "editorial," Def.'s Br. at 16, or to statements that reflect the broad policies behind enacting the statute, which just as easily support FDA's interpretation.

FDA's construction controls as long as it is permissible, which it is, *see infra* Section I.C, even if another interpretation is also reasonable. *Id*. at 843 n.11.[4]

      **B.**      **Prevor Wrongly Contends that the Word "Achieve" Implies a Requirement that Chemical Action Be More Important than Other Actions or that Chemical Action Be the Sole Method of Action.**

      To advance its argument that its interpretations reflect the unambiguous language of the device exclusionary clause, Prevor argues that the word "achieve" implies predominance, so that in order to achieve a primary intended purpose through chemical action, the chemical action must be more important than a product's other actions. *See* Mem. of P. & A. in Supp. of Prevor's Mot. for Summ. J. ("Pl.'s Br.") at 9; *see also* Prevor's Reply Mem. in Supp. of its Mot. for Summ. J. and in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 5-12. Prevor also suggests that the word "achieve" encompasses the notion that a primary intended purpose must be achieved "solely" through chemical action or "independent of" other actions. Pl.'s Opp'n at 6. That Prevor advances more than one interpretation of supposedly plain language further illustrates that the statute is ambiguous.

      These arguments are simply not borne out by the basic rules of grammar, the dictionary definition, or common usage. Prevor mistakenly asserts that "achieve" acts as a grammatical

---

[4] Courts afford *Chevron* deference to an agency's interpretation expressed in informal agency action such as the decision letter at issue here. *See Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 330-32 (D.C. Cir. 2011); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007); *Mylan Labs. Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004). Even if *Chevron* were inapplicable, FDA's interpretation would still be entitled to some deference due to the statute's complexity and FDA's specialized experience in implementing its extensive regulatory framework. *See U.S. v. Mead Corp.*, 533 U.S. 218, 234-35 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)); *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 90-91 (D.D.C. 2011); *Allergan, Inc. v. Crawford*, 398 F. Supp. 2d 13, 21-22 (D.D.C. 2005).

modifier in the device exclusionary clause, asserting that it modifies "through chemical action." Pl.'s Opp'n at 5. "Achieve" is a verb, not a modifier. *See* http://www.merriam-webster.com/dictionary/achieve; *see also* Strunk, W., Jr. and White, E.B., *The Elements of Style* (4th Ed. 2000) at p.95. A modifier is "[a] word or phrase that qualifies, describes, or limits the meaning of a word, phrase, or clause," for example, adjectives and adverbs.[5] *The Elements of Style* at p.89, 92. Examples of true modifiers that would qualify or describe the amount of chemical action needed at the levels Prevor desires would be adverbs such as "predominately," "primarily," or "solely," to modify the verb "achieve"—words that are absent from the exclusionary clause.[6]

Prevor argues that the meaning these adverbs and adjectives would provide is implicit in the verb "achieve," Pl.'s Opp'n at 5-7, but that runs afoul of basic grammar. Adverbs and adjectives are not implicit in verbs and nouns. If Prevor's contention were true, it would be unnecessary to use adverbs such as "predominantly," "primarily," or "solely" with the verb achieve. But people regularly use such adverbs when they want to convey how much a thing needs to contribute to the achievement of a purpose (*e.g.,* "achieve *predominately* through Joe's

_____

[5] A modifier is "an optional element in a phrase structure or clause structure" and, typically, can be removed without affecting grammar. If "achieve" is removed from the device exclusionary clause, the clause no longer makes sense, reading: "which does not [ ] its primary intended purposes through chemical action . . ."

[6] Prevor also make a convoluted and irrelevant argument concerning direct objects. Pl.'s Opp'n at 6. While the direct object of "achieve" in the statute is "primary intended purposes," it does not mean that the level of chemical action is specified; a modifier in the clause would still be needed to specify the level of contribution.

efforts," "achieve *primarily* through hard work," or "achieve *solely* through talent").[7]  Thus, "achieve . . . through chemical action" is an unmodified phrase, leaving the level of chemical action needed ambiguous.

Prevor's assertion that the dictionary definition of "achieve" is "accomplish" or "carry out successfully," Pl.'s Opp'n at 5, does nothing to advance its interpretation because, as previously noted, *see* Def.'s Br. at 13, these terms are synonyms.  If one inserts "accomplish" or "carry out successfully" into the device exclusionary clause, in order for the clause to have the meanings Prevor desires, as with "achieve," a modifier is needed (*e.g.,* "which does not accomplish its primary intended purpose *solely* through chemical action"; "which does not successfully carry out its primary intended purpose *primarily* through chemical action").[8]

Prevor also argues that FDA previously agreed that chemical action has to predominate in order to trigger the device exclusionary clause because of a question FDA asked during its review, *see* A.R. 015, and certain statements made in a review memorandum.  *See* Pl.'s Opp'n at

---

[7] Prevor also fails to recognize that, when a primary intended purpose is achieved through multiple methods of action, it is correct to say that each method of action achieves the primary intended purpose.  For example, Sally achieves her main goal (*i.e.,* primary intended purpose) to lose weight through diet and exercise.  Sally could have achieved weight loss through either one alone, but she used both methods to accomplish her goal.  In such a case, it is hard to parse out which pounds lost were attributable to which method (*e.g.,* diet or exercise), but that does not mean that neither diet nor exercise achieved her weight loss, or that only one can be said to have achieved her weight loss.  If Sally told her friend she achieved her weight loss through diet, her statement would be true.  If she told her friend she achieved her weight loss through exercise, that statement would be equally true.

[8] Prevor notes that the root of achieve is "chief."  Pl.'s Opp'n at 5, n.3.  However, "chief" is a different word, with a separate meaning not automatically grafted into the word achieve by virtue of ancient word roots.  In order to convey the idea that chemical action must predominate, a modifier is still needed (*e.g.,* "achieve . . . *chiefly* through chemical action").

28, A.R. 041, 058.  With respect to FDA's question, FDA requested clarification because Prevor

asserted that a study proved the dilution effect was less than half a percent, but did not provide

enough information about how the effect was measured to evaluate the statement's accuracy.

This question was posed early in the process simply to ensure the completeness of the sponsor's

request for designation and ensure FDA understood the information presented and the basis for

the sponsor's statements.  In addition, the question and statements were not made because FDA

agreed with Prevor's position, but because it was assessing whether the level of chemical action

reached the appropriate level.  For example, with respect to the first statement Prevor cites, after

the reviewer notes that certain studies do not address relative contributions, he points out that

they do, however, "provide information that would be useful in determining . . . whether a

component is acting in a chemical fashion," which is appropriate to consider.  A.R. 041.  Further,

FDA discussed relative contributions to show that, even assuming Prevor's "predominance"

standard was the relevant inquiry, the scientific evidence failed to show the predominance of

physical action.[9]

### C.     FDA's Interpretation of the Level of Chemical Action Needed Is Permissible.

Given the statute's ambiguity, FDA interprets the device definition to exclude a product

if chemical action meaningfully contributes to achieving the product's primary intended

purposes.  *See* Def.'s Br. at 10-14, A.R. 845-46.  The statutory text and scientific limitations

---

[9] Prevor mistakenly asserts that there is no data to support FDA's finding regarding
predominance, *see* Pl.'s Opp'n at 27, but Prevor's own studies provided the data, as well as the
published literature review and Prevor's claims.  FDA thoroughly explained why Prevor's
evidence did not demonstrate predominance and, instead, showed the importance of the
solution's chemical action.  *See infra* Section II; A.R. 852-55.

support this interpretation, and it follows this Court's instructions in *Prevor I*.  Again, because the device exclusionary clause is ambiguous with respect to the degree to which chemical action must contribute to achieving a product's primary intended purposes, the inquiry is not whose interpretation is more reasonable, FDA's or Prevor's; rather, the only question is whether FDA's interpretation is permissible.  *See Chevron*, 467 U.S. at 843, n.11; *see also Barnhart v. Walton*, 535 U.S. 212, 218 (2002).

### 1.    FDA Remedied the Issues Identified in *Prevor I*.

As this Court explained, FDA's previous interpretation was erroneous because it: (1) treated *any* purpose of the product as a primary intended purpose; and (2) permitted "achievement *even in part* of *any* purpose" through chemical action as sufficient for exclusion so as to prevent a device from having even a *de minimis* chemical action.  *Prevor I*, 895 F. Supp. 2d at 92, 100-01.  As to the Court's first concern, FDA reevaluated the evidence in light of the Court's admonitions regarding the definition of "primary."  FDA determined that Diphoterine Skin Wash had a single primary intended purpose (*i.e.,* to help prevent and minimize chemical burn injuries) and acknowledged that it previously erred in conflating the primary intended purpose with the method of action by which it was achieved.  Def.'s Br. at 8-10; A.R. 842-43.  Correctly identifying the primary intended purpose remedied the Court's first concern because FDA is no longer including *any* partial purpose.[10]  Def.'s Br. at 9-10.

---

[10] It is not improper for FDA to reevaluate the primary intended purpose as Prevor suggests, Pl.'s Opp'n at 3, when this Court revealed flaws in FDA's previous decision.  In its opening brief, the government noted that Prevor's own description of the primary intended purpose is inconsistent with the statute's terms.  Def.'s Br. at 9, n.8.  Moreover, Prevor continues to improperly conflate the primary intended purpose inquiry with the primary mode of action analysis under 21 C.F.R. Part 3.  *See, e.g.,* Pl.'s Opp'n at 3, 8 n.10, 15, 16.  The primary mode of action analysis is

With respect to the Court's second concern, *see* Pl.'s Opp'n at 12, there is more than FDA's mere assertion to guarantee that *de minimis* chemical action will not trigger the device exclusionary clause. "Meaningful" is defined as "full of meaning:  significant." *See* http://www.merriam-webster.com/dictionary/meaningfully.  That is the opposite of *de minimis*, which is defined as "lacking significance or importance:  so minor as to merit disregard." *See* http://www.merriam-webster.com/dictionary/de%20minimis.  Therefore, by definition, *de minimis* contributions will not trigger the exclusionary clause.[11]

> **2.     FDA's Remand Decision Sets Forth a Reasoned Basis for the Agency's Interpretation.**

Prevor suggests that because the words "meaningfully contributes" do not appear in the Federal Food, Drug, and Cosmetic Act ("FDCA") or prior classification decisions, their use is improper.  Pl.'s Opp'n at 5.  However, it is not improper for FDA to explain its interpretation of ambiguous statutory terms.  Prevor cannot legitimately criticize FDA for reaching its determination through a new approach, Pl.'s Opp'n at 7, n.8, when the Court found its previous approach flawed.  Moreover, FDA did not substitute the words "meaningfully contributes" for "achieves;" rather, because "achieve its primary intended purposes through chemical action"

---

separate from the primary intended purpose analysis, and is applied only *after* FDA classifies a product as a combination product to determine the appropriate Center assignment.  It is not relevant to determining whether a product meets the device definition.  Def.'s Br. at 24, n.20.

[11] Prevor's insistence that FDA did not address this Court's decision in *Prevor I* because its remand decision did not reference the Court's opinion throughout, *see* Pl.'s Opp'n at 1-4, is preposterous.  Although FDA's remand must be consistent with the law, including relevant court opinions, the test is not to count the number of citations.  Rather, it is whether the agency's decision substantive follows the court's opinion.  Additionally, the *Apotex* remand letter Prevor cites had a much longer procedural history, *see Teva Pharm. USA, Inc.*, 441 F.3d at 2 (explaining that the interpretive issue was before the court for the fifth time).

does not state how much chemical action is needed to trigger the exclusionary clause, FDA used the words to fill that gap.  A product is considered to "achieve its primary intended purposes through chemical action" when the product's chemical action meaningfully contributes to achieving its primary intended purposes.  FDA has to provide such an explanation where the language is ambiguous.[12]

Further, contrary to Prevor's assertion, *see* Pl.'s Opp'n at 7, FDA thoroughly explained why its current approach is reasonable.  Def.'s Br. at 10-14; A.R. 845-46.  FDA also explained how it determined that chemical action is meaningful, *see* Def.'s Br. 10-14, 19-23; A.R. 845-46, and, contrary to Prevor's contention, Pl.'s Opp'n at 12-13, provided criteria other than its "mere say-so."  Indeed, FDA explained that it took into account Prevor's claims about the significance of the solution's chemical action in making its determination.  A.R. 846.

Most standards FDA is charged with administering are not quantitative.  Rather, they involve scientific judgments based on evidence (*e.g.,* whether devices are "substantially equivalent," *see* 21 U.S.C. § 360c; whether products are "safe and effective," *see* 21 U.S.C. §§ 355, 360e; whether a product presents "a risk of illness or injury or gross consumer deception" to trigger recall, *see* 21 C.F.R. § 7.45).  That these standards involve some amount of

---

[12] Prevor continues to assert that "parallel language" in the device exclusionary clause and FDA's primary mode of action statute and regulations, 21 U.S.C. § 353(g), 21 C.F.R. § 3.2(m), weighs against FDA's interpretation, *see* Pl.'s Opp'n at 8, n.10, but there is no such parallel language.  Although "primary" is used in both, it modifies two different phrases, "intended purposes" in the exclusionary clause, and "mode of action" in the primary mode of action provisions.  A.R. 846.  In the exclusionary clause, "primary" does not modify "achieves . . . through."

subjectivity does not mean they are invalid, impossible to administer, or not science-based.[13]

Nor does it mean that reviewing courts are unable to evaluate whether FDA adequately

supported its determinations under these standards, as courts can and do assess whether FDA

acted arbitrary and capriciously in these contexts.  Thus, Prevor's concern that courts will have

to accept the agency's "mere say-so" on whether chemical action meaningfully contributes to

achieving a product's primary intended purposes, Pl.'s Opp'n at 13, is unfounded.

### 3.    Scientific Constraints Support FDA's Interpretation.

FDA's interpretation is also reasonable because it allows the agency to apply the device

exclusionary clause despite the limited scientific data that generally exists at the time sponsors

make requests for designation.  Def.'s Br. at 14; A.R. 841, 846.  While Prevor is correct in noting

that administrative convenience is subordinate to the *plain meaning* of a statute, Pl.'s Opp'n at 9,

here, as discussed, the statutory language is ambiguous.  Thus, Prevor's citation to *Goldstein v.*

*SEC*, 451 F.3d 873, 879-81 (D.C. Cir. 2006) and *Natural Res. Def. Council v. EPA*, 489 F.3d

1364, 1373-74 (D.C. Cir. 2007), is inapposite.  Policy concerns, including scientific constraints,

are not merely matters of administrative convenience; they are proper factors for FDA to

consider in interpreting the ambiguous language in the exclusionary clause.  *See Teva Pharm.*

*USA, Inc.*, 441 F.3d at 5 (explaining that in cases involving statutory ambiguity, "[i]t is up to the

agency to 'bring its experience and expertise to bear in light of competing interests at stake' and

---

[13] Even under Prevor's "predominance" standard, FDA would have to make a scientific
judgment call about whether chemical action reached that level and, because requests for
designation are often made early in a product's development, relative contributions of physical
and chemical action generally will not be known at all, much less with mathematical precision,
*see infra* Section I.C.3.

make a reasonable policy choice") (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797–98 (D.C. Cir. 2004)).

In addition, contrary to Prevor's suggestion, *see* Pl.'s Opp'n at 10, the fact that there is often limited data at the time sponsors submit requests for designation is not caused by FDA. Typically, when such designation requests are made, products are in the early stages of development.  They have not been extensively tested and little data may exist regarding how they work.  That is not a data limit FDA sets; that is simply the state of existing scientific knowledge. A.R. 841, 845-46.  Similarly, the page limit for requests for designation cannot be properly called a data limitation; rather, it is a limit on how existing data is presented or summarized.[14]

Prevor argues that FDA should not decline to use the "predominance" standard because of the lack of data at the product classification stage.  *See* Pl.'s Opp'n at 10.  That argument is misplaced.  Assuming FDA could adopt and implement a different interpretation, that fact would not be determinative; the only inquiry is whether FDA's chosen interpretation is permissible. *See Chevron*, 467 U.S. at 843, n.11.  Additionally, Prevor argues that FDA "regularly evaluat[es] the relative contributions of chemical versus physical action in the context of 'primary mode of action' analysis."  Prevor here again misstates the primary mode of action analysis.  Under the primary mode of action regulations, FDA evaluates which constituent part of the combination product (*e.g.,* drug versus device) makes the greatest contribution to the product's overall

---

[14] The record shows that Prevor's initial submission and response to FDA's questions totaled less than 15 pages, *see* A.R. 001-10, 011-14; Prevor submitted a 45-page petition under 21 C.F.R. § 10.75, *see* A.R. 725-770; FDA communicated extensively with Prevor, including a meeting on September 16, 2010, after which it received additional letters, *see* A.R. 771-83, and a meeting on January 15, 2013, during which Prevor made a 20-page presentation, *see* A.R. 817-837.  Prevor was provided with a full and fair opportunity to provide FDA with evidence.

intended therapeutic effects, not whether chemical versus physical action predominates.  Def.'s

Br. at 26.  Moreover, FDA's primary mode of action regulations provide an algorithm to

determine which Center will review a product when it is not possible to determine which

constituent part provides the greater contribution.  *See infra* § III.A.

### 4. FDA Does Not Have the Burden to Refute Prevor's Recommended Classification.

The Act and its implementing regulations make clear that the burden to establish a

particular classification falls on the sponsor.[15]  FDA does not have the burden to refute a

sponsor's recommended product classification.  Nevertheless, even if FDA had such a burden,

here it is met, because FDA conducted a comprehensive review and supported its decision with

ample evidence.  *See infra* Section II.

Prevor cites 21 U.S.C. § 360bbb-2(c), Pl.'s Opp'n at 14, which is entitled "Inaction of

Secretary," and states that if FDA does not make a classification decision within 60 days of a

request for designation, the sponsor's recommendation is considered final.  *See* 21 U.S.C.

§ 360bbb-2(c).  Prevor incorrectly concludes that this provision creates a "default classification."

But this is merely a mechanism Congress created to ensure that FDA issues a timely decision on

a sponsor's designation request.  This provision cannot logically be seen to impose a substantive

---

[15] The principle that the burden of proof rest with the party requesting action is engrained in our legal system, *see* MCMK-EVID § 337, and consistent with FDA's general regulatory scheme. *See, e.g.,* 21 U.S.C. § 355 (burden on drug sponsor to demonstrate safety and effectiveness); 21 U.S.C. §§ 360c, 360e (burden on device sponsor to demonstrate safety and effectiveness in pre-market approval), 21 U.S.C. §360(k) and Guidance on the Center for Devices and Radiological Health's Premarket Notification Review Program (1986), *available at* http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm081383.htm?utm_campaign=Google2&utm_source=fdaSearch&utm_medium=website&utm_term= (burden on device sponsor to demonstrate substantial equivalence in 510(k) process).

burden on the agency.  Indeed, Prevor's reading would encourage sponsors to submit bare-bones

information with minimal data to impair FDA's ability to disprove their recommendation,

effectively permitting sponsors to dictate the classification.[16]  Such a result would turn the

underlying statutory approval system on its head.

Prevor also suggests that FDA's reliance on all existing scientific evidence to support its

decision is somehow insufficient and that, instead, 21 U.S.C. § 360bbb-2(c) directs that the

agency's review is not complete unless it has affirmatively created evidence (*e.g.,* conducted its

own studies) to definitively show the relative contributions of a product's various methods of

action.  Pl.'s Opp'n at 11, 15.  The statute does no such thing.  Indeed, FDA must issue its

decision within a mere 60 days, which is insufficient time to design and conduct studies (even if

the product actually exists at the time of the request).  Rather, by providing such a limited time,

Congress made clear that it intended FDA's review to be limited in scope, based on information

submitted and clearly placed the burden on the sponsor.

## II.    The Scientific Evidence Supports FDA's Determination.

Noticeably absent from Prevor's response is any real criticism of the scientific evidence

supporting FDA's remand decision.  Prevor ignores, and wants the Court to ignore, the scientific

evidence establishing that the Diphoterine solution achieves its primary intended purpose

through chemical action.  Def.'s Br. at 17-24, A.R. 843-44, 846-49, 852-57.  Instead, Prevor

---

[16] This fear is not conjectural.  *See* A.R. 841, n.2 ("[I]n FDA's experience, sponsors sometimes
omit relevant information such as published literature if, for example, they are unaware of the
information or it calls into question their recommended classification or assignment.").

simply declares the evidence not voluminous or comprehensive, Pl.'s Opp'n at 4.  FDA's remand

response reveals otherwise.

The relevant question is whether the Diphoterine solution achieves its primary intended

purpose (*i.e.,* helping to prevent or minimize chemical burn injuries) through chemical action.

Contrary to Prevor's assertion, *see* Pl.'s Opp'n at 26, the answer is undisputedly yes.  Def.'s Br.

at 17-24, A.R. 843-44, 846-49, 852-57.  Indeed, the evidence highlights the importance of the

Diphoterine solution's neutralization properties to helping prevent and minimize chemical burns.

*Id*. at 18-19, 21-22, A.R. 852-53.  Prevor does not seriously contest that neutralization helps to

prevent and mitigate chemical burns.  *See* Compl. at ¶ 17 (explaining that the product was

developed "to minimize the damage caused by chemical burn injuries . . . ." and that "[i]t works

in two ways" one of which is chemical action).  Rather, Prevor characterizes this as "a secondary

benefit," Pl.'s Opp'n at 26, but achieving the primary intended purpose cannot be properly

characterized as a secondary benefit.

Additionally, contrary to Prevor's assertion, Pl.'s Opp'n at 20-21, FDA's determination

absolutely involves science.  The undisputed facts show that FDA devotes eight, single-space

pages to summarizing the scientific evidence supporting its decision.  A.R. 843-44, 846-49, 852-

57.  Prevor does not contest that FDA based its decision on *all* existing scientific data, including

an in-depth review of the published scientific literature, Prevor's claims on its website and

elsewhere, and Prevor's own unpublished studies.  *Id*.  FDA had to employ its scientific and

technical expertise to evaluate this evidence.  *Id*.  While the Court will ultimately decide whether

the administrative record supports FDA's decision, the Court must give deference to FDA

scientific findings.  *See, e.g., Rempfer v. Sharfstein*, 583 F.3d 860, 867-868 (D.C. Cir. 2009);

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320-21 (D.C. Cir. 1998); *Actavis Elizabeth, LLC*

*v. FDA*, 689 F. Supp. 2d 174, 179 (D.D.C.), *aff'd*, 625 F.3d 760 (D.C. Cir. 2010).

Prevor also attacks FDA's decision, claiming for the first time in this litigation that

neutralization occurs after the physical action and Diphoterine Skin Wash is intended as "an

immediate first response."[17]  Pl.'s Opp'n at 27.  But Prevor's argument that chemical action

cannot achieve the primary intended purpose because it occurs "after" the physical action is not

logical.  If the "physical action already has achieved" the primary intended purpose (*i.e.,* burn

prevention and mitigation), Pl.'s Opp'n at 26, there would be no reason to include an

unnecessary and presumably costly chemical neutralizing agent (*i.e.,* Diphoterine) in the product.

Were the effect of the chemical action (*e.g.,* the neutralization properties) truly insignificant,

Prevor might just as well sell a canister containing water.  Clearly, chemical action is critical to

this product.  *See also* http://www.prevor.com /EN/sante/RisqueChimique/diphoterine/

diphoterine.php ("In response to the mechanism of chemical burns, an efficient decontamination

*requires* . . . [the product] to stop polyvalently the six kinds of aggressive chemical reactions . . .

.")(emphasis added).[18]

---

[17] In support of its strained construction, Prevor cites the brief of *amici curiae* Alcoa, Inc. and the United Steel Workers at 9-12, Doc No. 21.  However, the cited portion makes a point about time being of the essence in bringing Diphoterine Skin Wash to market, not the speed of chemical versus physical action.  *Id.*

[18] Prevor criticizes FDA for not analyzing how long it would take for the neutralization action to have any effect, but it did not submit any studies examining the time course of the Diphoterine solution's physical or chemical effect.  As discussed, *see supra* Section I.C.4, FDA does not have a duty to undertake its own studies to generate data that is lacking in a sponsor's submission.  In addition, Prevor's contention that one of its studies demonstrated that without physical displacement "it would take 33 times more DSW to neutralize the chemical substance" and that "would obviously take much more time," Pl.'s Opp'n at 27, n.25, does not take into account the

III.   **FDA's Past Practice Is Consistent with Its Treatment of Diphoterine Skin Wash.**

     A.   **Medical Maggots and Reactive Skin Decontamination Lotion.**

     FDA provided a reasoned explanation for assigning Diphoterine Skin Wash to a different Center than medical maggots and Reactive Skin Decontamination Lotion. Def.'s Br. at 30-34; A.R. 857-59. With respect to medical maggots, FDA explained they were *sui generis* and that the decision was "so complicated by historical actions and product composition," it could not be considered valid precedent. *Id*. Contrary to Prevor's contention, *see* Pl.'s Opp'n at 17, the fact that medical maggots are one of a kind, living creatures was not expressed for the first time in the government's brief. FDA's remand decision stated that medical maggots are *sui generis* due to their composition, which is a clear reference to their physiology as living creatures. A.R. 857-59.

     FDA also addressed the Court's concerns regarding Reactive Skin Decontamination Lotion and justified its regulation by a different FDA Center Def.'s Br. at 30-34; A.R. 857-58. FDA established that the sponge in Reactive Skin Decontamination Lotion played a different and more important role than Diphoterine Skin Wash's canister because the sponge by itself (without the drug) would be expected to remove chemicals from the skin, consequently influencing the primary mode of action analysis and, thus, Center assignment. *Id*. at 31-32; A.R. 858. Similarly, FDA heeded the Court's instruction to evaluate the canister's propulsion, explaining there was

---

rest of the study's results. The referenced study is about the amount of chemical solution, not the time it would take for chemical versus physical action to have an effect. FDA responded that "physical displacement is not studied at all [in the referenced study] because none of the material was allowed to leave the beaker." A.R. 855. Further, the study showed that to achieve the same effect without Diphoterine "would require using a volume of water over *400 times greater* than the volume of DSW solution . . . ." A.R. 854.

no evidence in the record that, without the solution, the propulsion could prevent and minimize chemical burns. *Id*. at 32; A.R. 852; *see also* A.R. 855 (citing description of canister delivering an "aerosolized mist," suggesting its force is far *weaker* than an emergency shower). Unlike FDA's evaluation of the canister's propulsion, which the record supports, Prevor offers no citation or support for its statement that "[u]sing a dry sponge on a chemical splash would likely serve to rub chemicals *into* the skin . . . ." Pl.'s Opp'n at 18 (italics in original). Indeed, Prevor previously contradicted this assertion, stating that the sponge applicator will "help loosen and remove certain (but not all) offending chemicals by scrubbing." A.R. 732.[19]

In 2005, the agency promulgated the algorithm that helps it determine Center assignment for combination products. Prevor is mistaken when it contends that it was improper for FDA to treat its product differently than products that were submitted prior to this algorithm. *See* Pl.'s Opp'n at 18-19. Reactive Skin Decontamination Lotion was presented to the agency in 2003, and FDA explained that, if reviewed today, it may be treated differently based on the algorithm. Def.'s Br. at 33; A.R. 858. Prevor argues the promulgation of the algorithm was not a change in the law or practice, Pl.'s Opp'n at 18-19, citing a portion of the final rule's preamble, which states that it "will [fulfill its objectives] in a way that remains consistent with agency practice regarding the assignment of combination products. This rulemaking will codify criteria the agency has generally used since 1990." 70 Fed. Reg. 49,848, 49,849 (Aug. 25, 2005). However, the preamble explains that the final rule does several things, including creating definitions for

---

[19] Prevor criticizes FDA for finding that the Diphoterine solution could achieve burn mitigation without the canister because Prevor never "claimed" it could. Pl.'s Opp'n at 18. FDA must take into account the relevant scientific and physical properties, especially when they are so readily apparent.

"mode of action" and "primary mode of action," setting forth the algorithm, and requiring that sponsor's recommendations accord with the new rule. *Id.* Further, the preamble makes clear that the codified criteria in use generally since 1990 were the definitions, not the algorithm. *See id.* at 49,860.[20] Accordingly, FDA is correct when it contends that a change in its regulations is a proper reason for treating apparently similar products differently.

### B.    Similar Past Precedent.

Prevor criticizes FDA's remand decision for citing to certain classification decisions that the agency described as similar to Diphoterine Skin Wash but that FDA is prohibited by law from disclosing.  Pl.'s Opp'n at 15-17.  Prevor refers to these decisions as "secret documents," which is an unfair and inflammatory characterization.  *Id.*  Prevor alleges FDA could disclose these documents with redactions because the agency released certain letters in response to a Freedom of Information Act request by Prevor's counsel for classification decisions.[21]  However, FDA also withheld 59 classification decisions in their entirety because of "[t]rade secret and confidential commercial information, in general, and information, not previously publically disclosed, contained in a pending medical device application."  *See* Ltr. from F. Sadler, Director, Division of Freedom of Information, attached as Exhibit 1.

---

[20] To the extent Prevor is arguing that past precedents must be distinguished via the terms of the exclusionary clause, *see* Pl.'s Opp'n at 17, the case law does not support such view.  As the cases cited in government's opening brief make clear, an agency can provide legitimate reasons for disparate treatment by various means, including a potential past error or a change in the law.  Def.'s Br. 33-34.

[21] Tellingly, Prevor only requested classification decisions that resulted in assignment to the Center for Devices and Radiological Health.  It did not request classification decisions that resulted in assignment to the Center for Drug Evaluation and Research.

FDA is prohibited from disclosing the existence of a pre-market approval application or 510(k) submission before approval or clearance of the product.  *See* 21 C.F.R. §§ 312.130, 314.430 (drugs); § 601.50 (biologics); and, §§ 807.95, 814.921 (devices).  Accordingly, if a classification decision pertains to a non-public, uncleared or unapproved device or drug, FDA must withhold it as confidential.[22]  This is made clear in the very portion of FDA's website Prevor cites:  "[t]o this end, *once the product covered by an RFD has been approved or cleared*, the Office of Combination Products (OCP) will ordinarily post on this website its written jurisdictional determination . . . . "  Pl.'s Opp'n at 17 (citing http://www.fda.gov/ combinationproducts/jurisdictionalinformation/rfdjurisdictionaldecisions/redacteddecisionletters/ default.htm) (emphasis added).  The classifications referenced in FDA's remand decision were for products where FDA has not yet made a determination with respect to approval or clearance, while the released letters were for products that FDA has approved or cleared since the sponsor's request for designation.

Regardless, even without the non-public classification decisions, FDA provided ample evidence that its classification of Diphoterine Skin Wash was consistent with past practice.  FDA cited to, and Prevor failed to dispute, publicly available information regarding similar, drug-delivery devices that the Center for Drug Evaluation and Research regulates.  Def.'s Br. at 29-30; A.R. 851-52.  Further, as discussed, FDA adequately justified its treatment of medical maggots and Reactive Skin Decontamination Lotion.  Def.'s Br. at 27-34; A.R. 857-59.

---

[22] FDA is prohibited from releasing the classification decisions that distinguish medical maggots for the same reasons.  *See* Pl.'s Opp'n at 17.

**IV.** **Prevor's Requested Relief Is an Ill-Disguised Attempt to Have the Court Make Scientific Determinations.**

Should the Court disagree with FDA's interpretation or find that it did not sufficiently explain some portion of its decision, remand would be appropriate. Prevor uses circular logic to argue that, because FDA reached the same result as it did originally, *a fortiori* that result was "preordained" and, thus, the Court should preclude a second remand. *See* Pl.'s Opp'n at 2, 4. But, Prevor advances no evidence of bad faith or any indication that FDA was planning to reach its result regardless of the evidence. Indeed, Prevor's contention that FDA did not effectively reconsider its decision is contradicted by (1) the fact that FDA issued a 21-page, single-spaced decision on remand, (2) revised its interpretation to comply with this Court's opinion, (3) evaluated a voluminous amount of scientific evidence, and (4) took a close look at past precedents and provided legitimate reasons for assigning products that superficially appeared to be similar to different Centers. A.R. 839-59.[23]

The public interest is not harmed by FDA's determination as Prevor suggests. Pl.'s Opp'n at 22-23. FDA's classification decision does not delay access to Diphoterine Skin Wash because it is not a decision on access; it simply means the Center for Drug Evaluation and Research, not the Center for Devices and Radiological Health, will conduct premarket review for

---

[23] The cases Prevor cited are distinguishable. Def.'s Br. at 35. Indeed, the case Prevor touts, Pl.'s Opp'n at 21-22, *Tummino v. Hamburg*, 936 F. Supp. 2d 162 (E.D.N.Y. 2013), instructs that this Court should not grant Prevor's requested relief. There, the court criticized the Secretary of Health of Human Service for overruling FDA's decision, supplanting her judgment for FDA's. *Id.* at 170. Prevor requests that this Court do the same, supplant its judgment for the agency. Further, contrary to Prevor's contention, Pl.'s Opp'n at 22, a remand would not be inconsistent with *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 11-12 (D.C. Cir. 2006), because FDA solved its previous interpretation problems.

the product.  Prevor's assertion also assumes it could obtain 510(k) clearance at the Center for

Devices and Radiological Health, rather than being required to submit a premarket approval

application, but this is not a forgone conclusion.

Prevor also contends that the agency seeks to prevent the Court from exercising its proper

role in this litigation.  *See* Pl.'s Opp'n at 23, 24.  To the contrary, the government does not

suggest the Court is without equitable powers, nor does it seek to "preclude" the Court from

reviewing FDA's determination.  But the statute vests FDA with the authority to make decisions

on requests for designation.  *See* 21 U.S.C. § 360bbb-2.  The Court has authority to review

FDA's classification decisions.  *See* Def.'s Br. at 35.  In asking for a final, sweeping order that

Diphoterine Skin Wash is a device, however, Prevor wants this Court to do more than review

FDA's scientific determination about the properties involved.  It wants this Court to make

scientific conclusions and substitute its own scientific determination for that of the agency.  To

declare Diphoterine Skin Wash a device, this Court would have to reject FDA's interpretation of

ambiguous language regarding the level of chemical action that is appropriate and substitute

Prevor's contrary view of that language.  Further, under either FDA's or Prevor's interpretation,

the Court would have to rule against the weight of scientific evidence to find that the Diphoterine

solution did not trigger the device exclusionary clause because the record highlights the

importance of the solution's chemical action.  Def.'s Br. at 18-19, 21-22, A.R. 852-53.

Although FDA should be afforded great deference in its scientific determinations, the

Court may reject FDA's scientific analysis if it finds it unsupported.  *See, e.g., Rempfer*, 583

F.3d at 867-868; *Serono Labs., Inc.*, 158 F.3d at 1320-21; *Actavis Elizabeth, LLC*, 689 F. Supp.

at 179; *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997).  But, if the Court goes

another step, and grants the declaratory relief Prevor asks by ruling that the Diphoterine solution

is a device, then it will not only be rejecting FDA's interpretation and scientific analysis, it will

be inserting its own conclusions about the relevant science.  In so doing, the Court does not

simply "apply the appropriate APA standard of review . . . to the agency decision based on the

record," but essentially conducts a *de novo* inquiry and reaches its own conclusions in a matter

that Congress has entrusted to the agency.  *See Florida Power & Light Co. v. Lorion*, 470 U.S.

729, 743-44 (1985) (internal citations omitted); *see also Bennett v. Donovan*, 703 F.3d 582, 589

(D.C. Cir. 2013) (quoting *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012).

Thus, if the Court finds fault with FDA's remand decision, it cannot grant the specific relief

Prevor requests.  Def.'s Br. at 34.[24]

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in FDA's opening brief, this

Court should grant the government's motion for summary judgment and deny Prevor's motion

for summary judgment.

---

[24] The cases Prevor cites, *see* Pl.'s Opp'n at 24-25, change nothing.  All involve enforcement actions (where FDA is not asking the court to make a product classification, but rather, has already determined a product meets a particular definition before bringing suit) or interpretation of unambiguous language where Congress's meaning was plain.  *See United States v. Western Serum Co., Inc.*, 666 F.2d 335, 339-40 (9th Cir. 1982) (enforcement action and plain meaning); *United States v. Generix Drug Corp.*, 460 U.S. 453, 460 (1983) (enforcement action and plain language); *United States v. Undetermined No. of Unlabeled Cases*, 21 F.3d 1026, 1028 (10th Cir. 1994) (enforcement action and plain meaning); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) (Congress's meaning plain); *United States v. Regenerative Sciences, L.L.C.*, 878 F. Supp. 248, 255-56, n.5, 258 (D.D.C. 2012) (enforcement action, plain statutory language, and deference to FDA's interpretation of its regulations).

Respectfully submitted,

RONALD C. MACHEN, JR.
United States Attorney

Of Counsel:

STUART F. DELERY
Assistant Attorney General

WILLIAM B. SCHULTZ
General Counsel
Civil Division
Food and Drug Division
Office of General Counsel
MAAME EWUSI-MENSAH FRIMPONG
U.S. Dep't of Health and Human Services
Deputy Assistant Attorney General

ELIZABETH H. DICKINSON
Chief Counsel

MICHAEL S. BLUME
Director

ANNAMARIE KEMPIC
Deputy Chief Counsel for Litigation

ANDREW E. CLARK
Assistant Director

ANN M. OXENHAM
Associate Chief Counsel for Enforcement
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
White Oak 32, Room 4379
Silver Spring, MD 20993-0002

By:  s/John W. M. Claud
JOHN W. M. CLAUD
Trial Attorney
U.S. Department of Justice
Consumer Protection Branch
450 5th St. N.W., Rm. 6400
Washington, D.C. 20001
202-307-5747
john.claud@usdoj.gov

Dated: February 14, 2014

24

**<ins>CERTIFICATE OF SERVICE</ins>**

I, John W. M. Claud, hereby certify that I caused the forgoing Motion for Summary

Judgment and supporting documents to be served via the District Court's Electronic Filing

System (ECF) upon counsel for the plaintiff, Prevor:

John R. Fleder
Jeffrey N. Gibbs
Anne K. Walsh
Jennifer M. Thomas
HYMAN, PHELPS & MCNAMARA, P.C.
700 13th St., NW
Washington, DC 20005
Counsel for Plaintiff Prevor

By:  s/John W. M. Claud
JOHN W. M. CLAUD
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 5th St. N.W., Rm. 6400
Washington, D.C. 20001
202-307-5747
john.claud@usdoj.gov

Dated: February 14, 2014